OPINION OF THE COURT
Frederic S. Berman, J.
The defendant, Rosalyn Vese, stands accused of the crime of murder in the second degree (Penal Law, § 125.25). She has moved to suppress all statements made by her in relation to a fire which took place on January 20, 1979, at 158 First Avenue, in which her common-law husband was killed, thereby resulting in the instant criminal proceeding against her. Those statements fall into two categories: a series of "exculpatory” statements made to a police officer, two homicide detectives, and two fire marshals; and a set of confessions made to a homicide detective, a fire marshal, and an Assistant District Attorney.
In researching the varied issues in this case, the court would note the landmark and far-reaching opinion of the United States Supreme Court in Dunaway v New York (442 US 200), a decision which will have a substantial impact on the ability of law enforcement officials to conduct station *10 house interrogations of suspects in future cases. The significance of Dunaway, as it applies to this case, will be examined at some length later in this opinion.
The court, after a three-day Huntley hearing, and, after reading the extensive briefs submitted by both sides, makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
At approximately 1:55 a.m. on January 20, 1979, Police Officer Solberg responded to a report of a fire at 158 First Avenue, Apartment 6, in Manhattan. Upon learning that the fire resulted in the death of one Juan Torres, and that the defendant Rosalyn Vese had shared Apartment 6 with the deceased, Officer Solberg sought out the defendant. Solberg encountered her on the street, and, due to the bitter cold of that night, asked her to enter a police car to answer some questions.
Thus began a 16-hour period during which the defendant was the subject of police questioning. During that period, there occurred four series of statements which are the subject of the motion to suppress. First, there are "exculpatory” statements made to Officer Solberg in the car. Second, there are "exculpatory” statements made to a Detective Finelli at the first homicide zone. Third, there are "exculpatory statements” and a confession made to a Detective Chartrand and Fire Marshals Regan and Clarke at the first homicide zone. Fourth, there is a video taped confession made to an Assistant District Attorney at the homicide zone.
While sitting with her in the police car, Officer Solberg asked the defendant some basic pedigree information. When asked what happened, the defendant responded that she arrived home some time between 1:45 and 2:00 a.m. to find the apartment in flames. She stated that her efforts to put out the fire and rouse Juan Torres, who was sleeping at the time, were unsuccessful. She stated that she eventually abandoned her efforts and fled to seek help.
Officer Solberg got out of the car on several occasions to confer with firemen and other police officers. As a result of these conversation, Solberg learned that the fire was of suspicious origin. Solberg also learned that Detective Finelli wanted the defendant brought to the first homicide zone to *11 answer more questions. Each time Solberg exited the car, his partner remained inside the car with the defendant.
At approximately 3:10 a.m. Solberg informed the defendant that she would be going to the first homicide zone. Officer Solberg was asked on cross-examination:
"Q. Now would it be fair to say then after you spoke to Detective Finelli, you went back into the car and told Miss Vese that she would have to wait in the car until the detective spoke with her and she couldn’t leave until she did speak to the detectives?
"A. That’s correct.”
At another point in the cross-examination, he was asked:
"Q. Back in the car, after speaking to the detectives and your superiors, did you then tell her she would have to remain in the car until she spoke to the detectives and they would determine when she would leave?
"A. Yes.”
Solberg never formally placed the defendant under arrest, never handcuffed her, and never advised her of her Miranda rights.
The defendant was transported to the first homicide zone at approximately 3:30 a.m. Upon her arrival, the defendant requested and got permission to make a phone call. Solberg then remained with the defendant until Finelli arrived.
Detective Finelli had been at the scene of the fire gathering information. Among the things that he had learned was that the defendant and the deceased had had a stormy relationship, that the fire was deemed suspicious, and that the earliest the fire could have started was 1:45 a.m. Finelli started to question the defendant at approximately 5:00 a.m. He began the interview by giving Miranda warnings to the defendant. After each individual warning was read, Finelli asked, "Do you understand?” The defendant made no response to these questions. Indeed the defendant has no recollection of having received any warnings. However, after reading her the rights, Finelli asked, "Now that I have advised you of your rights, are you willing to answer questions without an attorney?” The defendant responded, "Yes.”
The interview lasted approximately 1 hour and 45 minutes, and ended at 6:45 a.m. The defendant repeated essentially the same story she told Officer Solberg. There was, however, one *12 significant change. She changed the time of her arrival at the apartment from 1:45 a.m. to 12:30 a.m.
Detective Finelli testified that he did not regard the defendant as a suspect when he questioned her. However he admits having ordered the defendant held for questioning, having telephoned defendant’s girlfriend to verify the defendant’s story about where she had been earlier that evening, having the defendant repeat her story over and over, confronting the defendant with the inconsistencies in her story, and having asked the defendant if she set the fire.
Neither Detective Finelli nor Officer Solberg ever told the defendant she was free to leave the station house until after the questioning was completed at 6:45 a.m.
She then proceeded to take the train to her mother’s house in The Bronx, arriving there at approximately 8:30 a.m. No sooner did she walk in the door than her mother told her that the police had called. The defendant returned the call, and was asked to return to the first homicide zone to answer some additional questions. She was informed that two fire marshals would come to pick her up. By 10:30 a.m. the defendant was back at the station house answering questions which were being put to her by three new questioners, Detective Chart-rand, and Fire Marshals Clarke and Regan. They had her recite her version of the events repeatedly. They confronted her with inconsistencies in her story. The questioning lasted until approximately 1:00 p.m.
At approximately 12:30 p.m. the defendant said to Fire Marshal Clarke, "I think I’m going to need representation,” or "I think I’m going to need an attorney.” In either case, Clarke took this to mean that the defendant wanted a lawyer and he so communicated that fact to Detective Chartrand and Fire Marshal Regan who were in another location of the station house at the time. Chartrand and Regan entered the room. Chartrand placed the defendant under arrest and gave her the Miranda warnings. The defendant’s response was "O.K. I’ll tell you the truth.” Chartrand said, "With or without your attorney?” and the defendant answered, "No, I’ll tell you the truth now.” The defendant then proceeded to confess that she had had a fight with the deceased earlier that evening and had left the house to visit a girlfriend. When she returned later, she found that the deceased had damaged her apartment and personal belongings. She then proceeded to place some newspapers under the bed where deceased was sleeping, *13 and set fire to them. When they started to burn, she threw water on the fire but could not put it out. She also called out to the deceased who was yelling for help. When she found she could not extinguished the flames, she tried to get help from a neighbor, and finally went downstairs and out of the building.
Detective Chartrand then contacted an Assistant District Attorney who arrived at approximately 2:15 p.m., but, due to her inability to contact a stenographer, was not immediately able to take a statement from the defendant. When the stenographer arrived shortly after 5 p.m., the confession was video taped. The defendant’s interrogation ended at 5:47 p.m.
The court also heard testimony of Dr. Brook, a psychiatrist called by the defendant. He testified that the defendant suffers from borderline schizophrenia with masochistic and passive dependent features. He also testified that, in his opinion, the defendant was unable to make a knowing and intelligent waiver of her rights on January 20, 1979. The factors cited by the witness were the defendant’s underlying mental condition, the effects of being deprived of food and sleep, the fire and events surrounding it, and defendant’s physical pain which was the result of a beating suffered by the defendant at the hands of the deceased. However, the court finds that the psychiatric testimony offered by the defense was so neutralized by the People’s cross-examination as to render it ineffectual on the issue of the "voluntariness” of defendent’s statements.
As previously stated, the court will consider separately each of the four series of statements which are the subject matter of this proceeding.
I. STATEMENTS TO OFFICER SOLBERG IN THE POLICE CAR
The statements made to Officer Solberg in the police car are not within the purview of Miranda, as the defendant was not in custody. The defendant concedes that the statements were not made in a custodial setting. Even without this concession, the law in this area is clear, as "[i]t is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.” (Miranda v Arizona, 384 US 436, 477-478.)
The factors which led to the defendant’s being questioned in the police car are significant. It was a bitter cold night and *14 the defendant’s apartment had just suffered a fire. (See People v Mason, 59 AD2d 580, defendant questioned in a police car because there were people sleeping in the house; the defendant was not in custody at the time of such questioning.) To like effect is Oregon v Mathiason (429 US 492) where the Supreme Court held that police officers are not required to administer Miranda warnings to everyone whom they question. Compare People v De Bour "not every encounter constitutes a seizure.” (40 NY2d 210, 216.)
In the instant case, no warnings were given; none were required.
Given the fact that the defendant was not in a custodial setting, the motion to suppress the statements made to Officer Solberg in the police car, is denied.
II. STATEMENTS MADE TO DETECTIVE FINELLI AT THE FIRST HOMICIDE ZONE
In opposing the defense contention that Ms. Vese’s statements to Detective Finelli were the product of an illegal detention, the People have relied on People v Morales (42 NY2d 129) which granted the police the right to detain an individual for investigatory purposes, under limited circumstances, for less than probable cause.
The far-reaching opinion in Dunaway v New York (442 US 200, supra), specifically invalidates the New York investigatory detention rule as set forth by the Court of Appeals in Morales.
Writing for the majority, Justice Brennan unequivocally rejected the balancing test in Morales that required law-enforcement agents to weigh the manner and intensity of the interference, the gravity of the crime involved, and the circumstances attending the encounter before engaging in custodial interrogation where probable cause was lacking (pp 213, 214). "[T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime.’ Johnson v. United States, 333 U.S. 10, 14 (1948). A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront. *15 Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proven protections afforded by the general rule, is reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but /’Terry-stops’ and border-patrol stops], the requisite 'balancing’ has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable’ only if supported by probable cause.”
The facts in Dunaway are similar to the facts here. In Dunaway, the police had information that the defendant was involved in a homicide. Although this information did not amount to probable cause for the defendant’s arrest, the police knocked on the defendant’s door, identified themselves, and asked the defendant if he would come to the police station to answer questions. The defendant assented. He was not told he was under arrest, not handcuffed, and not even touched or held on the way to the station house. Neither were any weapons displayed nor was he warned not to resist or flee.
Once at the station house, the defendant was placed in an interrogation room and given the Miranda warnings. The defendant waived counsel and made statements implicating himself in the crime.
The Supreme Court held that this type of seizure was impermissible as it was not based on probable cause. The court formulated a rule that this type of custodial questioning may not occur where there is less than probable cause for a full-fledged arrest.
The Supreme Court, in applying the law to the facts in Dunaway, stated (pp 212, 213): "the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor’s home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go’; indeed he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment’s requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest’ under state law. The mere facts that petitioner was not told he was under arrest, was not 'booked’, and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes [citation omitted], *16 obviously do not make petitioner’s seizure even roughly analogous to the narrowly defined intrusions involved in Terry and its progeny. Indeed any 'exception’ that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable’ only if based on probable cause.”
It is the People’s position in the instant case that the defendant consented to the interrogation and was not in custody when she was taken to the police station. The facts of the case, however, lead to the opposite conclusion. From the moment Officer Solberg encountered the defendant, she was not left by herself. A policeman was always with her, guarding her. In fact, the defendant was told directly that she could not leave until she was questioned at the police station. This makes out an even stronger case for custody than Dunaway, since the police in Dunaway never directly told the defendant that he must accompany them.
Having decided that the defendant was seized in the Fourth Amendment sense when she was involuntarily taken to the police station, we turn to the question of probable cause. Probable cause to arrest exists if the facts and circumstances known to the arresting officer warrant a prudent man’s believing that an offense has been committed. (People v Oden, 36 NY2d 382.)
The detention of the defendant herein replicates almost entirely the court’s description of the detention of defendant in Dunaway. Both cases clearly involve custodial, not consensual, interrogation. Like Dunaway, the defendant was taken to a police car, transported to a police station, and placed in an interrogation room. Far from being told that she was "free to go,” defendant in the instant case was told by Officer Solberg that she could not leave until the detectives who were investigating the fire gave her permission to leave. Some five hours later, the defendant was allowed to leave the first homicide zone. She went to her mother’s house, and learned on her arrival there that two fire marshals were on their way to pick her up and take her back to the station house — a circumstance that can only have suggested that the earlier permission to leave had been withdrawn and that she had no choice but to go with the fire marshals.
And like defendant Dunaway, the defendant herein was detained without probable cause. At the time she was originally taken into custody and taken to the first homicide zone *17 for questioning, Detective Finelli, who interrogated the defendant, knew only that the deceased had lived with the defendant, that the two persons had had a stormy relationship, that they had fought prior to the fire and that the fire was suspicious. Furthermore, Detective Finelli testified that the defendant was definitely not a suspect when he released her at approximately 7:00 a.m.
It is clear that, at the time the defendant was taken to the station house, probable cause for her arrest did not exist. Therefore, her seizure was unlawful.
There remains the question of whether the defendant’s statements were sufficiently attenuated from the illegal seizure so as to render them admissible at trial. In Brown v Illinois (422 US 590), the Supreme Court enumerated three factors to be considered on the question of attenuation. They are: the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.
The defendant here was seized without probable cause in the hope that, perhaps, something significant might be uncovered. There was no intervening circumstance of any consequence. Therefore the statements made to Detective Finelli were clearly the result of the defendant’s illegal seizure.
In Dunaway the Supreme Court placed great reliance on the fact that the defendant was not told that he was free to leave, and, indeed, would have been prevented from leaving had he attempted to do so. Part of the ripple effect of Dunaway may be the need for law enforcement, particularly the police, to review its procedures and consider advising suspects of their rights either to leave the precinct or not to go to the precinct for further interrogation in those instances where probable cause to make an arrest is lacking.
Such a procedure has been suggested in the ALI Model Code of Pre-Arraignment Procedure (Approved Draft 1975) (§ 110.1, subd 2) which is cited in a footnote in the case of Oregon v Mathiason (429 US 492, 498, n 3, supra).
In oral argument relating to this motion, the People placed great reliance on Oregon v Mathiason (supra). Such reliance is misplaced as the facts in Mathiason are clearly distinguishable from those found here. In Mathiason, a police officer left his card at the defendant’s residence. The defendant called the officer the next day and was asked where it would be convenient to meet. When the defendant indicated he had no *18 preference, the officer suggested the State patrol office which was near the defendant’s house. Upon his arrival, the defendant was told that he was not under arrest. The court held that the defendant voluntarily appeared for questioning and that he was not in custody.
Defendant has posed the proposition that the impact of Dunaway is so sweeping as to overrule the line of decisions decided by the Court of Appeals in People v De Bour (40 NY2d 210, supra), and its successors. This court is not prepared to assert that Dunaway overrules De Bour since the latter deals primarily with street encounters whereas the former is concerned with precinct interrogations. However, the appellate courts of our State may now have to review De Bour in light of Dunaway to determine what portion, if any, of the De Bour doctrine has been rendered inapplicable.
Therefore, the motion to suppress the statements made to Detective Finelli at the first homicide zone is granted.
III. STATEMENTS MADE TO DETECTIVE CHARTRAND AND FIRE MARSHALS CLARKE AND REGAN AT THE FIRST HOMICIDE ZONE
The defendant was brought back to the first homicide zone after arriving at her mother’s home only to learn she was wanted for further questioning. Clearly, the rule of Dunaway applies with equal strength to this situation. In Dunaway the defendant made a second and more complete statement on the day following his seizure. There, the Supreme Court found that the lapse of time did not attenuate the second statement obtained subsequent to the defendant’s illegal seizure. In the instant case, the act by the officers of accompanying the defendant back to the police station constituted a second illegal seizure within the meaning of Dunaway.
Aside from Dunaway, the defendant further maintains that any statements at the precinct were made involuntarily in the classic due process sense since the defendant had been without food for 24 hours and without sleep for 30 hours.
Involuntariness is a term used to describe circumstances which render a confession inadmissible either because of its inherent untrustworthiness or because of the illegality of the police methods employed in obtaining it. (Spano v New York, 360 US 315.) "[T]he involuntariness of an inculpatory statement may usually best be uncovered by looking at the 'totality of the circumstances’ under which it came about”. (People v Anderson, 42 NY2d 35, 38.)
*19 The defendant had not been awake any undue length of time when she spoke with Detective Finelli, and she did not make any claim of fatigue to him. Indeed, when she was asked by Detective Chartrand several hours later whether she was well enough to answer questions, she said that she was. When the defendant first spoke with Finelli it was not even time for breakfast. In any event, she was offered sustenance and wanted only hot chocolate. By her own testimony, when she went home at about 7:00 a.m. she did not take the time or make the effort to get anything to eat, even after she knew that she would be going back to the precinct and was waiting for her ride. Moreover, she specifically declined an offer of food made later in the day by Chartrand and Finelli.
This court does not conclude that the absence of food and sleep under the factual pattern of this case rendered any statements involuntary, per se.
The suppression of the statements is based solely on the doctrine of Dunaway.
Furthermore, it is uncontroverted that at 12:30 p.m., prior to confessing to Detective Chartrand and Fire Marshals Clarke and Regan, the defendant expressed the desire to speak with an attorney. Detective Chartrand placed the defendant under arrest, and readvised her of her Miranda rights. The defendant waived counsel and confessed.
In People v Buxton (44 NY2d 33, 38) the Court of Appeals held that "when a suspect makes known his desire for an attorney * * * the police may not immediately and actively seek a waiver of this right and then proceed to interrogate him in the absence of counsel.” A whole line of case law in this State reaffirms that basic position. Clearly, then, all statements made after the defendant requested counsel must be suppressed.
The motion to suppress the exculpatory statements and confession made to Detective Chartrand and Fire Marshals Clarke and Regan at the first homicide zone is granted.
IV. THE STATEMENTS MADE TO THE ASSISTANT DISTRICT ATTORNEY
The confession to the Assistant District Attorney closely followed the one to the police. This proximity in time, plus the absence of a significant intervening circumstance, renders the second confession inadmissible under the rule in Buxton (supra).
Additionally, the confession made to the Assistant District *20 Attorney was the direct product of the defendant’s illegal arrest. As was stated in the concurring opinion of Justice Stevens in Dunaway "[t]he temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one.” (442 US, at p 220.)
Both sides have requested a ruling from this court as to whether the confession is suppressed solely on the basis of its being obtained after she had requested counsel, or whether it is suppressed on the broader grounds of classic due process involuntariness.
This could become significant at the trial if the defendant should testify and the People seek to impeach her by use of this confession under the doctrine of Harris v New York (401 US 222).
The court had the opportunity to view the video-taped confession. In observing the demeanor of the defendant, the court finds that even at that late hour, she appeared alert, articulate, coherent, and knowledgeable of the facts of the case. Nor was there any apparent indication that the defendant’s confession was the product of force or coercion.
The confession, therefore, is being suppressed on the basis of the failure of the defendant to be supplied with counsel after expressing a desire to have counsel. (See People v Buxton, 44 NY2d 33, supra.)
CONCLUSION
In view of all of the foregoing, the motion to suppress the statements made in the police car is denied. The motion to suppress all statements and confession made at the station house is granted.