**UNITED STATES, Appellant,**

v.

**Charles E. ALLEN, III, Appellee.**

**No. 80–1163.**

District of Columbia Court of Appeals.

Argued July 7, 1981.

Decided Nov. 23, 1981.

---

Karen J. Krug, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry, Michael W. Farrell, and Jerry S. Goren, Asst. U. S. Attys., Washington, D. C., were on the briefs, for appellant.

W. Edward Thompson, Washington, D. C., for appellee.

Before NEWMAN, Chief Judge, and KELLY and MACK, Associate Judges.

KELLY, Associate Judge:

The government appeals a decision to suppress evidence, which the trial court found had been obtained in violation of the Fourth Amendment. We affirm insofar as the ruling held statements made to police at headquarters, several hours after appellee had been transported there in a squad car, and the consent to search his cab given at that time, were the product of an unlawful detention; consequently, the statements and items found in the cab are inadmissible against appellee at trial. We hold, however, that appellee's statement made to a police officer at the scene was voluntary and not the fruit of an illegal seizure of his person.

I

At the time the following events took place, appellee was employed as a custodian by the D. C. Public Schools and worked as a cab driver during off-hours. On February 14, 1980, having decided to drive his cab during the lunch hour, appellee notified the Capitol Cab Company dispatcher that he was available. The dispatcher told him to pick up a fare on Quackenbos Street, N.W., and take her to Providence Hospital. On the way to the hospital, a man in the street flagged appellee's cab, got in and asked to be taken to First & Seaton Streets, N.W. Unbeknownst to appellee, he had just accomplished what the entire District of Columbia police force was then trying to do: he had picked up Bruce Griffith, a suspect in the murder of a District of Columbia police officer, and the subject of an intense city-wide manhunt.

After dropping the first fare at Providence Hospital, appellee and Griffith drove to several addresses. While they were travelling in the vicinity of First & V Streets, N.W., a police car pulled alongside the cab and the officers requested appellee to pull over. Griffith made it clear he opposed such a move, and appellee just managed to remove himself from the cab before a gun battle erupted as Griffith attempted to flee in the cab. The cab collided with a parked car. Griffith, while firing at the police officers, left the cab and was struck down in a hail of bullets.

After the smoke cleared, appellee approached one of the many police officers then on the scene and identified himself as the driver of the cab. He was asked to wait in the back seat of a police cruiser, which he did. Though appellee was not handcuffed or guarded as he waited, the back doors of the police cruiser could not be opened from the inside, so he could not have exited from the car had he attempted to do so. Approximately 17 minutes after the shooting, Detective Warren Joseph Donald of the Homicide Branch arrived on the scene. Donald entered the police cruiser where appellee was waiting, introduced himself and said, "I would like to talk to you." According to Donald, appellee immediately responded:

My name is Charles Allen. That's my cab. I don't know that man. I'm scared to death. I don't know what's going on. Only thing that I can tell you, only thing I've got to worry about is, sometimes when I hack, I carry a .22 revolver for my protection. If you find that, that's for me, but what's going on, I don't know anything about.

Following that exchange, and approximately five minutes of further questioning, Detective Donald accompanied appellee while he searched for his jacket, which had been lost as he crawled out of the line of fire. Then Donald advised appellee that, "he would have to come to our office with us." At that point, appellee was frisked by another police officer. He then entered

Donald's unmarked police car and was taken to the Homicide Office at 300 Indiana Avenue. Although appellee attempted to talk with the officers during the ride to Headquarters, Detective Donald asked him to say nothing until they arrived.

At the Homicide Office, at approximately 4:00 p. m., appellee was taken to an interview room where he was advised of his rights. Appellee and Officers Donald and Wade signed a PD 47[1] form on which the first sentence reading, "You are under arrest," was crossed out. Appellee agreed to answer questions without first consulting an attorney, and proceeded to give a narrative of the events of the afternoon. At about 4:10 p. m., he agreed to give a more detailed, typewritten statement. That statement (seven pages long) was completed, typed and signed by 8:10 p. m. During the intervening four hours, appellee consumed about three cups of coffee, but no food, and left the interview room only to go to the men's room approximately seven or eight times. On those trips, he was accompanied by Officer Donald, ostensibly because of the many press people in the building, to whom the police did not want appellee to speak until the statement had been completed.[2]

The most important development that occurred during the afternoon, however, took place at 5:00 p. m., when appellee was asked whether he would consent to a search of his cab, which had been severely damaged during the shootout and then towed from the scene to Police Headquarters. Appellee signed a consent form permitting police to search the vehicle.

A .22 caliber gun, located in a holster under the left front floor mat, and a small quantity of marijuana were found during the search. Sometime after 8:00 p. m., appellee was told of the discovery and Officer Donald informed him he would be charged with possession of the items. Appellee was again read his rights from a PD 47, this time including the sentence, "You are under arrest." Appellee agreed to give another statement regarding the gun, which he did. On February 27, 1980, appellee was charged by information with carrying a pistol without a license, D.C.Code 1973, § 22–3204, and possession of marijuana, D.C.Code 1973, § 33–402.

Appellee moved to suppress the evidence obtained on February 14, including all statements, the gun and the marijuana. Following two days of hearings, at which the only persons to testify were police officers, the court denied the motion. However, on the next morning, when the trial was to begin, the judge, *sua sponte*, announced that he would reconsider the motion to suppress in light of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Counsel were permitted time to read the case and present further argument. That afternoon, the court decided the evidence had to be suppressed, since under *Dunaway* appellee had been unlawfully seized, in violation of the Fourth Amendment. The government noted this appeal.[3]

## II

We agree with the motions judge that *Dunaway v. New York, supra*, is relevant to the facts of this case. However, rather than combine all the events that transpired

---

1. The PD 47 contains the warnings as to rights which are required to be read to suspects under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The form also contains questions regarding the suspect's understanding of these rights and whether he will voluntarily waive the right to have an attorney present during questioning. At the bottom there are blank spaces for signatures of the "defendant," the officer and a witness.

2. During this period, there was some suspicion on the part of the police that appellee might

have been an accomplice or a compatriot of Griffith's. For example, an officer telephoned the cab company to verify the radio dispatch to Quackenbos Street, and spent several hours attempting to contact the other passenger in the cab to see if she could confirm appellee's story. In addition, a mobile crime technician interrupted the questioning at 5:45 p. m., to swab appellee's hands for the purpose of determining whether he had fired a gun.

3. D.C.Code 1973, § 23–104(a)(1).

between appellee and the police, the several stages of their confrontation must be separately analyzed to determine at what points the rule of *Dunaway* may have been violated.

The Supreme Court's holding in *Dunaway v. New York, supra,* reaffirmed the general rule that an official seizure of a person must be supported by probable cause, even if no formal arrest is made. In *Dunaway,* a police officer told a detective that an informant had supplied a lead implicating Dunaway in the shooting death of the proprietor of a Rochester pizza parlor four and a half months earlier. Without probable cause to arrest, three detectives went to Dunaway's residence, transported him to the police station and detained him there for questioning. In an opinion by Justice Brennan, the Court held that this was a violation of the Fourth Amendment, reasoning that a custodial interrogation requires full probable cause and that reasonableness is not the appropriate test in that context. Justice White concurred on the ground the police conduct was so similar to an arrest that probable cause was necessary to support the detention. He disagreed, however, with language in the Court's opinion indicating that *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), was a unique exception to the requirement of probable cause. Justice Stevens, also concurring, cautioned that the exclusionary rule should embody objective criteria rather than subjective considerations.

*Michigan v. Summers,* —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), clarifies the holding of *Dunaway. Summers* concerned the detention of an occupant of premises being searched for contraband pursuant to a valid warrant. The Court held that to require the occupant to reenter the premises and remain until the search was completed was not an unreasonable intrusion upon that person's privacy, and was not prohibited by the Fourth Amendment. We read *Dunaway,* as did the Supreme Court in *Summers,* as recognizing that,

some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases, the intrusion on the citizen's privacy "was so much less severe" than that involved in a traditional arrest that "the opposing interests in crime prevention and detection and in the police officer's safety" could support the seizure as reasonable. [*Id.* at 2591; citations omitted.]

Our task then is to determine whether what occurred here was a much less severe intrusion than a traditional arrest,[4] and whether the police actions met the Fourth Amendment's standard of reasonableness, in light of the needs of those charged with enforcing the laws and protecting the public.

### III

#### A. *The Statement in the Car at the Scene*

■ We do not consider it unreasonable for police officers to ask a material witness to a homicide to remain briefly at the scene so that officers may obtain whatever information he or she possesses regarding the incident. In this case, although the motions court ruled appellee was detained involuntarily, we cannot ignore the undisputed fact that he presented himself to the police and identified himself as the driver of the cab. In these circumstances, it was not inappropriate to ask appellee to wait in the back seat of a police cruiser (appellee's own vehicle was severely damaged). The fact that the cruiser was constructed so that one sitting in the rear seat could not exit on his own initiative does not shed light on whether or not appellee was being held there against his will. There are obvious practical reasons for incorporating such a design feature: some occupants of the back seat of a police cruiser are not supposed to exit at will. Simply because the police car was built to accommodate persons police will not

---

4. In its brief, the government vigorously contends that no arrest took place until 8:00 p. m., after the gun and marijuana were found in the cab.

allow to leave in no way mandates a conclusion that appellee was not free to go if he so desired.

 Furthermore, appellee's initial statement to Detective Donald was not given in response to questioning, but was entirely spontaneous and unprompted by police. Therefore, it was error to order it suppressed. *See Calaway v. United States*, D.C.App., 408 A.2d 1220, 1225 (1979).

While appellee was not criminally allied with Bruce Griffith (although there are indications the police were not certain of that at all times), he participated in the episode in which Griffith was killed. We decline the invitation to apply *Dunaway* in this context to prohibit the police from talking with a material witness who presents himself to authorities at the scene of a shooting,[5] simply because the conversation took place in the back of a police vehicle. More is required to show an unlawful detention than a police request that an individual wait in the back seat of a police car on the scene, particularly during the month of February.

We note that our conclusion, that *Dunaway* does not require exclusion of the statement made in the police car, is the same as that reached by a New York court under very similar facts. *People v. Vese*, 100 Misc.2d 8, 417 N.Y.S.2d 1015 (Sup.Ct.1979). In that case, police were investigating an apartment fire which had resulted in the death of a man. Knowing only that the defendant shared the apartment with the deceased, an officer who encountered her on the street asked her to enter a police car to answer some questions. When asked some "basic pedigree information" the defendant made exculpatory statements which she later moved to have suppressed. The court pointed to the factors that led to the questioning in the police car: that it was a bitter cold night, and defendant's apartment had just suffered a fire. The court concluded that the defendant was not questioned in a custodial setting, that *Miranda* warnings were not required, and that the motion to suppress the statements should be denied.[6]

Considering the circumstances at the scene in this case, the police were entirely reasonable in asking appellee to wait in one of their cars so that they could interview him. We hold, as a matter of law, that appellee's Fourth Amendment rights were not violated on this score. *Michigan v. Summers, supra; Dunaway v. New York, supra.*

### B. Statements at Police Headquarters and Consent to Search the Cab

Since we perceive a significant difference between interviewing appellee at the scene, and transporting him to police headquarters for questioning, we affirm the ruling that statements made at headquarters cannot be used against appellee at trial and that the consent he gave to search his cab was unlawfully obtained.

 The initial inquiry that we must undertake is whether appellee was "seized" within the meaning of the Fourth Amendment when the police transported him to headquarters and detained him there for four hours. This is a question of law, which we must answer based on our own evaluation of the record. *Cf. Giles v. United States*, D.C.App., 400 A.2d 1051, 1054 (1979) (determination of when "arrest" occurred is question of law). In answering that question, we look for guidance not only to *Dunaway v. New York, supra*, in which the Supreme Court held, on the basis of facts very similar to those here, that the defendant was "seized," but also to *Terry v. Ohio, supra*, in which the Court stated, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of

---

5. In this context, although not investigating a crime as such, the police were obliged to gather information concerning the use of deadly force by officers attempting to capture a fugitive. Appellee was the last person to speak to Griffith before his death.

6. The court in *People v. Vese, supra* at 1019–21, citing *Dunaway, supra*, went on to order suppression of other statements made by the defendant after she was taken to police headquarters and questioned, and at a point when police lacked probable cause to arrest her.

persons. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16.

■ Though appellee was not formally arrested before he was taken to the police station, he nevertheless was told, "you *have to* come to homicide with us." (Emphasis added.) Whether he would have appeared voluntarily at the police station, given the choice, is entirely speculative—he *had no* choice. In many respects, appellee was treated more like a suspect than a mere witness. He was frisked before he was placed in the police car, and from the moment he arrived at headquarters, he was constantly guarded. He was not even allowed to go to the bathroom alone. Furthermore, his hands were tested to determine if he had fired a gun. In our view, although appellee's conduct at the station could otherwise be characterized as "cooperative," these precautions are not consistent with the government's hypothesis that his acquiescence in accompanying the police was wholly voluntary.[7] The conduct of the police amounted to a "show of authority" sufficient to restrain appellee's liberty. *Id.*

The fact that appellee never specifically expressed a desire to leave is not dispositive. As in *Dunaway v. New York, supra*, he was never informed that he was free to go, and indeed, Detective Donald testified that appellee would not have been permitted to leave had he requested or attempted to do so. *See id.* 442 U.S. at 203–12, 99 S.Ct. at 2251–2256. The police were determined not to let him out of their sight until they were certain that he was no more than an innocent bystander in the Bruce Griffith affair. Thus, although appellee was not formally arrested and booked until the end of his four-hour detention at police head-

quarters, the circumstances render his detention at police headquarters, "in important respects indistinguishable from a traditional arrest" for purposes of Fourth Amendment analysis. *Id.* at 212, 99 S.Ct. at 2256.

Given the factual similarities between *Dunaway v. New York* and the instant case, *Dunaway* permits but one conclusion: appellee was "seized" for Fourth Amendment purposes when he was transported to police headquarters and detained and interrogated[8] there for four hours. *Id.* at 207, 99 S.Ct. at 2253. Furthermore, since the police lacked probable cause, which the government does not dispute, that seizure was unlawful. *Id.*, at 216, 99 S.Ct. at 2258.

■ The consent to search the cab, and appellee's subsequent statement regarding the gun, were both direct products of that unlawful detention. Indeed, the government does not contend otherwise. Appellant was in continuous police custody for over four hours, and the record reveals "no intervening events of significance whatsoever." *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975), quoted in *Dunaway v. New York, supra* 442 U.S. at 218, 99 S.Ct. at 2259. Nor is the Fourth Amendment violation cured by the fact that appellee was warned of his *Miranda* rights approximately one hour before he signed the consent form. "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, . . . the effect of the exclusionary rule would be substantially diluted." *Dunaway v. New York, supra* at 217, 99 S.Ct. at 2259 (quoting *Brown v. Illinois, supra* 422 U.S. at 602, 95 S.Ct. at 2261).

When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police

---

7. We note also that appellee had been on his lunch break when the shoot-out occurred, and was apparently expected to return to work that afternoon. The police questioning obviously prevented him from doing so and was thus not conducted on appellee's own free time or at his convenience.

8. The trial court's earlier finding that no "interrogation" took place refers only to the statement made in the police squad car at the scene of the shoot-out.

misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

\* \* \* \* \* \*

To admit [the disputed evidence] in such a case would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." [*Id.* at 218–19 (quoting Comment, 25 EMORY L.J. 227, 238 (1976)).]

We thus affirm the trial court's ruling that the Fourth Amendment requires suppression of appellee's statements made at police headquarters and of the evidence seized from the cab pursuant to the unlawfully obtained consent.

## C. *Inevitable Discovery*

■ The government finally argues that under the doctrine of "inevitable discovery" the contraband found in the car should not be suppressed. The "inevitable discovery" exception to the exclusionary rule (also known as the "hypothetical independent source" doctrine), provides that evidence otherwise unlawfully obtained may nevertheless be admissible if the court finds that the evidence inevitably would have been discovered pursuant to lawful means. *See generally Crews v. United States*, D.C.App., 389 A.2d 277, 291–95 (1978) (en banc), *rev'd on other grounds*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 Colum.L. Rev. 88 (1974) [hereinafter cited as Columbia Note]. The doctrine has been afforded only limited recognition by this court, however. In *Crews v. United States, supra*, we all but rejected the doctrine, and narrowly confined its applicability to cases in which discovery of the evidence is truly inevitable;

only if the court is persuaded "with certainty" that the evidence would have been discovered lawfully may the exclusionary rule be waived. *Id.* at 295. We conclude, as we did in *Crews*, that the doctrine cannot be applied in this case without damaging the underlying purpose of the exclusionary rule.

The government contends that appellee's cab would have been searched even without his consent, pursuant to written police procedures requiring that when a vehicle is seized as evidence the police "shall completely inventory the contents of the vehicle . . . ." MPD General Order Series 602, No. 1, "Automobile Searches and Inventories," Pt. 1B–2(b) (May 26, 1972). In essence, the government's assertion is that routine investigative procedures would have revealed the gun. We cannot agree.[9]

The government's reliance upon routine investigative procedures carries with it a heavy burden: "In the special breed of cases in which the government contends that 'routine investigative procedures' would lead to 'inevitable discovery,' the government must show that the procedure 'is *clearly routine* and its results *readily predictable.*'" *Crews v. United States, supra* at 295 (quoting Columbia Note, *supra* at 93) (emphasis added). The government cannot meet that burden here. The officer in charge of the search conceded that the search was not conducted for the routine purpose of inventorying the car, but rather, it was conducted for the specific purpose of finding the gun, which the officers knew was somewhere inside the car. Thus, the search focused almost exclusively on the glove compartment and under the front seat. Nevertheless, and most telling, the police *did not find the gun* the first time they looked for it, despite the fact that the search was specifically tailored to that purpose. Under these circumstances, we can

---

9. Because we hold that the contraband in the cab would not "inevitably" have been discovered even pursuant to a lawful search, we need not reach the question of whether a lawful search would have been authorized in the first place, either by a hypothetical judicial determination of probable cause, or by the automobile exception to the warrant requirement, *see Rob-* *bins v. California*, —— U.S. ——, 101 S.Ct. 2841, 2844–45, 69 L.Ed.2d 744 (1981); *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Chambers v. Maroney*, 399 U.S. 42, 48–52, 90 S.Ct. 1975, 1979–1981, 26 L.Ed.2d 419 (1970).

hardly say with certainty that a routine inventory search [conducted *without* the tainted information] would "inevitably" have revealed the gun, or that the results of such a search would be "readily predictable" at all. *Id.*[10]

Search, unlike some other aspects of police work, is peculiarly unpredictable. Thus, while one can determine with reasonable certainty what would be learned by a license or identification check, it is much more difficult to ascertain whether tainted items, especially if hidden when found, would also have been discovered in the course of a legal search. Because the prosecution must show both that a proper search would have been conducted in the absence of information acquired through illegal means, and that such a search would have turned up the evidence in question, the application of the inevitable

discovery exception in such cases has been quite limited.

\* \* \* \* \* \*

The more difficult ... question is whether the discovery of hidden evidence can *ever* be termed "inevitable." [Columbia Note, *supra* at 94–95; footnote omitted; emphasis supplied.]

For the above reasons, the ruling of the trial court is reversed in part and affirmed in part.

*So ordered.*

---

**10.** *District of Columbia v. M. M.*, D.C.App., 407 A.2d 698 (1979), is not to the contrary. In that case, an officer made a *Terry* stop of two men who matched a radio description, following a nearby robbery twenty-five minutes earlier. He transported them to the scene of the crime for identification, whereupon he arrested them. Before placing the suspects in the car, however, he conducted a *Terry* frisk. He patted a paper bag carried by one of the men, and admitted that he could tell at that point that the bag merely contained a camera. He nevertheless opened the bag and removed the camera.

The court held that despite the unlawfulness of the seizure, the evidence could be admitted under the "inevitable discovery" doctrine, since the officer independently obtained probable cause to arrest the suspect moments later, and the camera certainly would have been discovered during the inevitable search incident to that lawful arrest. *Id.* at 702. In this case, by contrast, we cannot be certain either that a lawful search would have been conducted (*i. e.*, that a warrant would have been obtained), or that the gun inevitably would have been found.