SCHWARTZ, Senior Judge
(dissenting).
I cannot accept that a sixteen year old with no previous record, who was stopped by police officers who swerved their car in front of him on his way to school, asked to come to the station with them and told whether he is able to make football practice depends on how the questioning goes, may be deemed to have voluntarily “consented” to his ensuing, otherwise constitutionally unsupportable imprisonment.
Gut reaction aside, the factual and legal analysis which supports my disbelief in the majority’s conclusion to that effect is well stated in the appellant’s brief. It is quoted, almost in its entirety as follows:
The trial court erred in denying Joshua Ladson’s motion to suppress his statements which were obtained through custodial interrogation after his illegal arrest. Consideration of the totality of the circumstances in this case compels the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station, as a reasonable person in his position would not have believed that he was free to disobey the police officers who took him to the police station for questioning. As the police lacked probable cause to believe that he had committed any offense at the time of that arrest, and as the statements obtained shortly after the illegal arrest were not purged of their primary taint, the trial court erred in denying the motion to suppress those statements.
A confession is not admissible at trial if it was obtained through custodial interrogation after an illegal arrest, unless the causal chain between the arrest and the confession is broken, and the confession is “sufficiently an act of free will to purge the primary taint.” Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
The record in this case establishes that (1) on the morning of August 22, 2006 two members of a homicide investigative team pulled their vehicle halfway onto the grass and asked Joshua (who was on his way to school) his name, Joshua remained with these detectives until two more members of the team pulled up in another vehicle, confirmed *814 his identity and asked him if he was willing to go to the police station with them, no one told Joshua that he was not under arrest and that he did not have to come with them, they frisked him before he entered their vehicle for transport to the police station, when they arrived at the police station, Joshua was placed inside of an interrogation room in the homicide office, Miranda warnings were administered, and he was interviewed by one or two detectives at a time for several hours; (2) at the time of this de facto arrest, the police lacked probable cause to believe he had committed any offense; and (3) the statements obtained shortly after the illegal arrest were not purged of their primary taint.
A seizure of the person within the meaning of Fourth and Fourteenth Amendments of the United States Constitution and Article 1, Section 12 of the Florida Constitution occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. See Kaupp v. Texas, 588 U.S. 626, 123 S.Ct. 1843, 1845, 155 L.Ed.2d 814 (2003); Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Michigan v. Chesternut, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).
The courts have taken into account a number of different considerations in deciding whether or not a certain situation constituted an arrest or only consensual presence. See Wayne R. LaFave, 3 Search and Seizure § 5.1(a) at 4-9 (4th ed. 2009 Update). Applying those considerations to the facts of this case compels the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station.
1. “The consideration most frequently cited in the cases finding consent is that the police specifically advised the suspect that he was not under arrest or that he was free to leave if he wished .... though it is important to note that the explanation can be nullified by other police conduct of a coercive nature ... Likewise, the cases coming down on the arrest side of the issue often note that such explanation was lacking.” LaFave, § 5.1(a), at 4-5 (footnotes omitted); see Kaupp v. Texas, 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (defendant’s transportation to police station constituted an illegal arrest where defendant taken to crime scene and then to interrogation room at the police station with no indication he was free to decline); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (defendant’s transportation to police station constituted an illegal arrest where defendant was picked up for questioning, driven to police headquarters, placed in an interrogation room, and never was informed he was free to go); B.S. v. State, 548 So.2d 838, 840 (Fla. 3d DCA 1989) (failure to advise suspect that she was not required to accompany police officers, and had every right to refuse “decisive on the side of the conclusion that compliance with police authority ... is not voluntary”); compare Taylor v. State, 855 So.2d 1 (Fla.2003)[.]
In the present case, none of the several detectives who spoke to Joshua Lad-son (either a few blocks from his home, in the car on his way to the police station, or at the station) ever told him that he was free to go or that or that he *815 was not under arrest (SR.76, 86-87, 122). The trial court, in clear error below, improperly found that this fact has “no weight in this analysis for the purposes of this second issue as to whether or not he was in custody when he was transported to the police department.” (SR.122).
2. The chances of a finding of consent are enhanced if the police put the matter to the suspect only in terms of a request, but the situation is otherwise if the suspect’s presence is ordered or if the initial police “request” is negated by other events. LaFave, § 5.1(a) at 4; see Kaupp v. Texas (suspect’s response of “Okay” after suspect told “we need to go and talk” not a showing of consent under the circumstances); B.S. v. State, 548 So.2d at 840 (“The officers phrased their wish for the appellant to come with them in terms of what they ‘wanted’ her to do. In our judgment, this term, while perhaps not so coercive as an order or demand, is much closer to that end of the continuum than a clearly non-mandatory ‘request’ or invitation.”); United States v. Allen, 436 A.2d 1303, 1309 (D.C.App.1981) (defendant told “you have to come to homicide with us”; deemed coercive); compare Craig v. Singletary, 127 F.3d 1030 (11th Cir.1997) (no arrest where after defendant volunteered to help them, police asked him if he would come down to the police station, and defendant agreed to do so).
Detective Segovia testified that he asked Joshua Ladson if he was willing to go to the police station. However, when asked by Joshua if he “would be back on time to go to football practice[,]” Detective Segovia responded “that all depended on how the interview — on how the interview went.” (SR.37). This response indicates that his request was in fact mandatory, not permissive.
Additionally, when the two detectives initially approached Joshua and asked him his name, they pulled their car halfway onto the grass. (SR.36). Joshua then remained with them until Detective Segovia and Detective Dominguez arrived in a second vehicle. A reasonable person in this situation would not have believed he was free to leave. See G.M. v. State, 19 So.3d 973 (Fla.2009).
3. “Resort to physical restraint is almost certain to result in a holding that an arrest had been made ... .while the lack of such restraint is a consideration pointing toward consent.... But the situation can amount to an arrest even though there were no formal words of arrest and no booking.” LaFave, § 5.1(a) at 4 (footnotes omitted).
When the two detectives initially approached Joshua they pulled their car halfway onto the grass and asked him his name. (SR.36). From that point forward, when two more detectives came to the scene, he was at all times in the presence of officers. While being transported to the police station, Joshua was seated in the front seat and not handcuffed, but he was frisked prior to entering the car. At the police station, he was kept inside an interrogation room and officers were either present inside the room or outside the room at all times.
At least one Florida court has found that the giving of Miranda warnings converts a consensual encounter into an arrest. See Raysor v. State, 795 So.2d 1071 (Fla. 4th DCA 2001) (en banc).
“Because Miranda rights are not required to be read to suspects unless they are undergoing custodial interrogation, it follows that a person who has been read his Miranda rights would reasonable assume that he is not free to leave.” *816 Raysor, 795 So.2d at 1072 (citation omitted). But see Caldwell v. State, 985 So.2d 602 (Fla. 2d DCA 2008), review granted 7 So.3d 1097 (Fla.2009) (disagreeing with the Fourth District and finding that an officer who contacted defendant did not transform a consensual encounter into an illegal seizure by giving Miranda warning); LaFave, § 5.1(a) at 4 (“Moreover, ‘the issuance of Miranda warmings as a cautionary measure’ does not itself transform the situation into a Fourth Amendment seizure.”) (footnote omitted).
In this case, Joshua Ladson was given his Miranda warnings and signed a written waiver of these rights. Pursuant to Raysor, this fact evidences that a reasonable person would not assume that he is free to leave.
5. “Various [additional] circumstances can contribute to the conclusion that the defendant’s presence at a police facility or in a police environment was voluntary. Included are that the suspect appeared at the station without there being any prior police request that he do so .... that he actually volunteered to appear when he learned the police were interested in speaking with him ... .that he appeared following a request from the police which reached him via a third party ... .that he determined the time and place of the police contact .... that he transported himself to the police facility ... or that he actually stated he did not view the encounter as an arrest.... Courts also take into account facts tending to show that the suspect ‘deliberately chose a stance of eager cooperation in the hopes of persuading the police of his innocence.’ ” LaFave, § 5.1(a) at 4 (footnotes omitted).
None of these factors indicating consent are present in this case.
6. “Other circumstances which are coercive in nature or which limit the suspect’s options, on the other hand, are likely to influence a finding that consent was lacking. Included here are such circumstances as that police were holding some of the suspect’s effects .... that they deprived him of his means of departure .... that the suspect was aware the police already had substantial evidence of his criminal involvement .... that many officers were involved in the encounter .... or that the suspect was subjected to intensive interrogation .... Obviously, the youth or inexperience of the suspect must also be taken into account.” LaFave, § 5.1(a) at 4 (footnotes omitted).
Several of these factors indicating that an arrest took place are present in this case. Four different detectives were involved in the encounter with Joshua Ladson. There was no evidence that he was experienced with the criminal justice system. (SR.131). Additionally, and significantly, Joshua Ladson was a 16 year old juvenile at the time he was taken to the police station. See B.S. v. State, 548 So.2d at 839-840 (“Of foremost importance is the simple fact that B.S. was a seventeen-year-old juvenile. Youth has often been held almost necessarily to involve a vulnerability to the wishes of adult authority figures like policemen which is the antithesis of an exercise of the child’s free will.... See Schneckloth v. Bustamonte, 412 U.S. at 248, 93 S.Ct. at 2058, 36 L.Ed.2d at 875 (‘The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling [and] low intelligence....’) ... Again, the fact that it is a juvenile who is told that adult officers “want” her to come in surely bears negatively on her ability to resist.”); Kaupp v. Texas, 123 S.Ct. at 1847 (17-year-old defendant’s *817 transportation to police station constituted an illegal arrest; “a group of police officers rousing an adolescent out of bed in the middle of the night with the words ‘we need to go and talk’ presents no option but ‘to go.’ ”).
In light of these factors, the consideration of the totality of the circumstances in this case compels the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station, as a reasonable person in his position would not have believed that he was free to disobey the police officers who took him to the police station for questioning.
This court’s decision in B.S. v. State is illuminating as it involves application of the considerations listed in Lafave to reach the conclusion that a 17-year-old juvenile was involuntarily arrested rather than having voluntarily accompanied police officers to the police station.
On appeal, this court first set forth the “legal parameters” of the issue to be decided:
If B.S. went to the station because she had been the subject of the functional equivalent of an arrest — which was admittedly unjustified — the confession must be suppressed as the tainted product of that improper incarceration .... On the other hand, if she went there on her own accord and without coercion, there was no illegality which would preclude the validity of the confession.
548 So.2d at 839 (citations omitted). This court then noted that determining into which category a particular set of facts falls is a process which must be based on the totality of all the surrounding circumstances, and that the only relevant inquiry is how a reasonable person in the suspect’s position would have understood the situation. This court looked to the considerations listed in § 5.1(a) of LaFave and concluded that B.S. had been involuntarily detained:
1. Of foremost importance is the simple fact that B.S. was a seventeen-year-old juvenile. Youth has often been held almost necessarily to involve a vulnerability to the wishes of adult authority figures like policemen which is the antithesis of an exercise of the child’s free will.... 2 W. La-Fave, Search & Seizure § 5.1(a), at 392 (“Obviously, the youth or inexperience of the suspect must also be taken into account.”)
[[Image here]]
1. It is admitted that, despite the virtually inherently coercive situation in which B.S. found herself — one in which even an enunciation of the policeman’s wishes might naturally have led her to think they must be obliged — the officers did not disabuse her of this belief by specifically telling the girl that, as was indeed the case, she was not required to accompany them and had every right to refuse. Such a failure is decisive on the side of the conclusion that compliance with police authority — made without specific knowledge of the right to refuse — is not voluntary. As LaFave says:
The consideration most frequently cited in the cases finding consent is that the police specifically advised the suspect that he was not under arrest or that he was free to leave if he wished. Likewise, the cases coming down on the arrest side of the issue often note that such explanation was lacking.... 2 W. LaFave, Search & Seizure § 5.1(a), at 390-91, and cases cited at nn. 23-24 (footnotes omitted). Moreover, the coercive effect of a lack of *818 contrary explanation is emphasized when a child, who might be even less expected to know or act upon his rights, is involved.
⅜ ⅝ ⅝ ⅝ ⅜ ⅜
8. The officers phrased their wish for the appellant to come with them in terms of what they “wanted” her to do. In our judgment, this term, while perhaps not so coercive as an order or demand, is much closer to that end of the continuum than a clearly non-mandatory “request” or invitation. See 2 W. LaFave, Search & Seizure § 5.1(a), at 391, and cases collected at nn. 26-28.
[[Image here]]
4. Just as significant are the other, perhaps unique, circumstances involved in this case. Faced with the information that the child was home alone with her younger brother, the officers neither waited for her mother to return, nor decided to leave and come back later themselves.... Instead, they waited while the appellant changed from her pajamas and drove her to the police station with her brother in tow. The only impression this series of events could reasonably evoke is that the officers were not going to take no, or even a delayed yes, for an answer and that no opposition to their desires would do any good.
⅝ ⅜ ⅝ ⅜ ⅜{ ijs
In sum, we find that, as a matter of law B.S.’s presence in the police station was not procured through her voluntary consent and the confession which resulted should have been suppressed.
548 So.2d at 889-841.
Three of the four factors which led this court to hold in B.S. that the 17-year-old juvenile did not voluntarily accompany the officers to the police station are present in this case as well. And although this case does not involve the same situation that officers who were faced with information that the child was home alone with her younger brother neither waited for the mother to return nor decided to leave and come back later themselves, but rather drove her to the police station along with her younger brother, this case has the fact that the officers waited until Joshua left his home alone to walk to school. (SR.30-31). Instead of waiting outside of his home to catch him “alone” on his way to school, the officers could have knocked on the door to his home where he lived with his mother and brother.
Independent consideration of all the factors deemed relevant by the courts and the leading treatise on the subject supports the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station.
Although it seems clear that B.S. presents what is probably an a fortiori situation and thus requires reversal in this case, the majority barely acknowledges its existence. Its reasons for failing to follow it are, with respect, unpersuasive.
It is not enough, as the court says, that the trial judge, as she surely did, conscientiously fulfilled her duty of determining what she sincerely believed to be the correct result. Under our system it is our nondelegable obligation to determine whether that result, however regularly arrived at, was legally right.[8],[9]
*819 Let’s face facts, the only real difference with B.S. is that it involved a minor (in both senses) theft of money and this one was a homicide (which appellant undoubtedly committed). But there is no serious crime-obvious guilt-indispensible-to conviction exception to the law that evidence secured in violation of the Constitution is not admissible. It is unfortunate that the majority creates and applies that heretofore only mythical doctrine in this case. I believe its determination to do so is very wrong.

. The identities of the trial and appellate judges in the individual case are of no mo *819 ment. The appellate court must prevail because that is the way we operate. In short, as has often been said, we are not last (or at least later) because we are right, we are right because we are last.

. It also makes no difference that B.S. was only a split decision with a well-reasoned dissent. In this court, even a misguided majority rules.