**UNITED STATES, Appellant,**

v.

**Mark K. GAYDEN, Appellee.**

No. 84–578.

District of Columbia Court of Appeals.
Argued Dec. 19, 1984.
Decided May 20, 1985.

Daniel S. Seikaly, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Charles W. Brooks, Asst. U.S. Attys., Washington, D.C., were on brief, for appellant.

James M. Lenaghan, Washington, D.C., for appellee.

Before NEWMAN, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

The government appeals the suppression of appellee's oral and written confessions, which the trial court found were obtained in violation of the Fifth Amendment. Because we conclude the oral confession was the product of an arrest made without probable cause and the written confession was obtained by exploitation of the illegal arrest, *Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 600–01, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975), we affirm.

## I

The evidence presented at the suppression hearing established that on March 2, 1983, the police responded to a call about a shooting in the vicinity of the 700 block of 19th Street, N.E., and found a man who had been shot several times. The victim, identified as Bart Black, named Poochie and Rabino or Rabinol as his assailants. The Washington Area Law Enforcement computer showed 17 listings for Poochie, and the modus operandi section of the Metropolitan Police Department contained 21 listings for that nickname; there were no listings for Rabino or Rabinol. The police interviewed several of Black's friends for information about "a Poochie." One friend told Detective Helwig that he knew several Poochies and only one Rabino, who was also called Rabbit.[1] Another friend, Greg Torrell, told Helwig that Mr. Black knew appellee Gayden, who was nicknamed Poochie, and directed the officer to Gayden's home.

On March 10, 1983, around 11 a.m., Detectives Helwig and McGinnis went to Gayden's home. They told Gayden that they were investigating Mr. Black's death.[2] Gayden said that he knew Mr. Black, was disturbed by his death, and would help in any way possible to learn who was responsible. The officers asked Gayden to accompany them to the police station for questioning, but told him that he did not have to go. Gayden agreed, saying he would be happy to get everything cleared up. The detectives told Gayden's grandmother that it was unnecessary for anyone to go with him, and that Gayden would be back in approximately 15 minutes. The police then drove Gayden to the homicide office, arriving at approximately 11:30 a.m., and going directly into an interrogation room.[3] Detective Helwig did not remove his gun when they entered the room.[4]

The first interview began at approximately 11:40 a.m. when Detective Helwig informed Gayden that he would like to take a statement of what Gayden knew. He told Gayden he could read and sign the statement, and that he was free to leave at any time. Gayden then related general information about the shooting, including the name of the alleged killer, Greg Torrell, who Gayden said had remained mute when asked about the murder. He based his information on what he had heard and denied any direct knowledge or involvement in the killing. The interview lasted until 1:05 p.m.

Detective Helwig began a second interview at 2:20 p.m. because he was dissatisfied with Gayden's first statement, which he thought contained inconsistencies, and because he thought Gayden was not telling all he knew. Helwig began the interview with the question: "Poochie, do you want to tell me the truth about Bart's murder?" In his second statement, Gayden admitted that he was present at the scene of the murder and described a 1978 beige LTD car that allegedly had been used to flee the murder scene and had caused damage to other cars. He also named several individuals who were present, including the alleged killer, "Turk" (Howard Owens), who owned the LTD car. This interview ended at 3:05 p.m.

From the beginning of the first interview to the conclusion of the second, Gayden was told repeatedly that he was free to go at any time and did not have to say anything. Helwig testified that at the conclusion of Gayden's second statement he would have been "happy to drive [Gayden] back right [then]." No offer was made,

---

1. Rabino/Rabbit is Joel Bryant, a codefendant. He is not involved in this appeal.

2. Detective Helwig conceded on cross-examination, however, that he also may have told Gayden he was under suspicion for unauthorized use of a vehicle.

3. The interrogation room was approximately 8 feet by 8 feet and was furnished with only a desk, a couple of chairs and a typewriter; there were handcuffs in the room.

4. Detective Helwig testified that if a person is not a suspect, the normal procedure is for the officers to continue to wear their guns.

however, although Detective McGinnis was going to Gayden's neighborhood to check the car mentioned in Gayden's second statement. During the time Detectives Helwig and McGinnis were checking the first and second statements, Gayden remained in the interrogation room; no one questioned him further, and he was alone most of the time. The door to the interrogation room was unlocked and may or may not have been open while Helwig and McGinnis went in and out. The interrogation room was located behind the anteroom in the back of the building, and any stranger in the anteroom would have required permission to be there, and any unfamiliar person walking through the homicide branch would have been questioned by police officials. When Gayden left the interrogation room, he was taken through a back door by Detective Helwig to the locked bathroom across the hall.

Because of inconsistencies between Gayden's first and second statements, Detective Helwig was dissatisfied with Gayden's second statement and decided to "stall." He checked the information about the car and conferred with Sgt. Daly and another police officer about Gayden's statements and the police investigation of the murder, including McGinnis' report that the LTD car had not caused damage to the parked cars at the murder scene. Helwig thought Gayden was lying, but still considered him a suspect and did not think he had probable cause to arrest him. Helwig suggested it might be a useful "technique" for another officer with whom Gayden had not established a rapport to confront Gayden. Sgt. Daly therefore reviewed Gayden's statements. Daly concluded Gayden was lying

and went into the interrogation room and confronted him.

Sgt. Daly, accompanied by Detective Clark, entered the interrogation room and confronted Gayden, at approximately 5 p.m. Daly told Gayden that he knew he was lying, that he obviously had lied in the first statement and was lying in the second statement. He also told Gayden that the reason he knew Gayden was lying was because Mr. Black had not died immediately, had told the police about the murder, and had identified Gayden as the killer. At this point, Gayden made his third statement, admitting, "Yes, I shot him." A couple of minutes later, Daly informed Helwig that Gayden had confessed. Helwig and McGinnis immediately went into the interrogation room and advised Gayden of his *Miranda*[5] rights for the first time. Gayden was then placed under arrest and waived his rights by answering "yes" to the questions on the "Defendant Suspect Statement." Gayden then made a fourth statement, which Helwig put in writing and Gayden signed.[6] This interview ended at approximately 6:30 p.m.

Gayden did not testify at the suppression hearing. He called as witnesses his grandmother and Dr. Zeligman, a clinical psychologist who had administered intelligence and personality tests to Gayden. The psychologist testified, as an expert in intelligence testing, that Gayden was functioning in the borderline rank of intelligence, with an IQ of 78, and tended to become disorganized in threatening situations. He was of the opinion that Gayden did not believe he was free to leave the homicide office on March 10, was confused, and did not under-

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. The statement reads in part:
    Q. Poochie do you want to tell me the truth about the death of Bart Black?
    A. Yes.
    Q. Do you fully understand the right waiver you just signed her [sic] on this piece of paper?
    A. Yes.

    Q. Are you making this statement to me of your own free will?
    A. Yes.
    Q. Do you want to go to the bathroom again?
    A. Yes. (broke from 5:05 to 5:10 P.M. to go to the bathroom).
    Q. Did you shot [sic] and kill Bart Black?
    A. Yes.

stand the consequences of waiving his rights.

## II

■ The trial court suppressed Gayden's oral and written statements on Fifth Amendment grounds. A review of the evidence reveals, however, that "this case turns on proper application of policies underlying the Fourth Amendment exclusionary rule, not on the Fifth Amendment or the prophylaxis added to that guarantee by *Miranda.*"[7] *Brown v. Illinois, supra,* 422 U.S. at 606, 95 S.Ct. at 2263 (Powell, J., concurring). Thus, our initial inquiry is whether Gayden was "seized" within the meaning of the Fourth Amendment and, if so, at what point the seizure occurred. This is a question of law which we must answer based on our assessment of the evidence, *United States v. Allen,* 436 A.2d 1303, 1308 (D.C.1981); *Giles v. United States,* 400 A.2d 1051, 1054 (D.C.1979), while giving due deference to the trial court's findings of fact, which are supported by the evidence, surrounding Gayden's encounter with the police. *Giles, supra,* 400 A.2d at 1054; *see Calaway v. United States,* 408 A.2d 1220, 1225 (D.C. 1979).

### A.

■ The Fourth Amendment applies to "seizures" of a person which do not result in a full scale arrest. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). It is well-settled that "not all personal intercourse between policemen

and citizens involves 'seizures' of persons. Only when an officer, by means of physical force or a show of authority has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16, *cited in United States v. Allen, supra,* 436 A.2d at 1309. This court has said there is a restraint of freedom when there is an actual or constructive seizure or detention which has been undertaken with the objective of effectuating an arrest and is so understood by the person being detained. *Giles, supra,* 400 A.2d at 1053 (quoting *Jenkins v. United States,* 161 F.2d 99, 101 (10th Cir. 1947)). Whether the officer announced or expressly disclaimed an intent to arrest is not determinative of whether an arrest has occurred, and neither is a defendant's subjective belief. *Id.* at 1054. The test is whether under all of the circumstances a "reasonable man" innocent of any crime would have thought he was not free to leave. *See Hicks v. United States,* 127 U.S.App.D.C. 209, 212, 382 F.2d 158, 161 (1967) (quoting *United States v. McKethan,* 247 F.Supp. 324, 328 (D.D.C.1965), *aff'd by* Order No. 20059 (D.C.Cir. Oct. 16, 1966)).

■ With regard to Gayden's first two statements, we agree with the trial court, for the reasons set forth in its Memorandum Order, that Gayden had not been seized and was not being illegally detained[8] when he made them, *Giles, supra,* 400 A.2d at 1054–55, and that his first two statements were voluntary.[9] *Culombe v.*

---

**7.** *Miranda v. Arizona, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**8.** The trial court found that Gayden was not "in custody." The analysis is essentially the same for determining whether one is "in custody" or has been "seized" or "illegally detained," *viz.,* whether one has been "deprived of his freedom in any significant way," *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612 (defining custodial interrogation), or whether a person's liberty has been "restrained." *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Since we decide this case on Fourth Amend-

ment grounds, we refer to "seizure," "illegal detention" and "arrest" and not to "in custody."

**9.** We do not, however, agree with the trial court's conclusion that all of the expert's testimony was influenced by what Gayden had told him, and was, therefore, not to be credited. The evidence about Gayden's limited intelligence was based on intelligence tests which, according to the expert witness, were not influenced by anything Gayden had said. Moreover, the expert testified his conclusions that Gayden did not think he was free to leave the homicide office, that he was confused, and that he did not appreciate the consequence of his waiver of his

*Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). In regard to the third statement, the trial court found the situation had "changed significantly" during the two hours between the end of Gayden's second statement and his oral confession. The court found the police were convinced, after checking Gayden's second statement, that he was Mr. Black's killer.[10] Noting that Daly admitted that his purpose in confronting Gayden was to get an admission, the court found that "[n]ot only was the confrontation sharply accusatory in character, but it was also done in such a manner as to imply that Gayden's situation had changed so significantly that he was no longer free to go." (Memorandum Order at 8). We hold that the trial court's findings that the circumstances existing immediately before Sgt. Daly confronted Gayden indicated the police were convinced that Gayden had killed Mr. Black, and that Gayden was not free to leave are supported by the record.

The government contends, however, that Gayden was not under arrest prior to his formal arrest. First, it relies on Gayden's statement that "I want to help myself.... I am going to stay and do this. This is more important," citing *Giles, supra,* 400 A.2d at 1054–55, and on the trial court's finding that Gayden "apparently believed he could clear himself of complicity in ... [the] murder," as evidence that Gayden apparently was confident of his ability to talk himself clear of whatever suspicion the police might have had. Gayden's statement, however, was made at the beginning of his second interview by the police and would have little bearing on subsequent events which occurred more than two

hours later. When Sgt. Daly confronted Gayden, he had been at the police station for over five hours. At this point, Gayden's detention in the police station "was in important respects indistinguishable from a traditional arrest." *Dunaway v. New York, supra,* 442 U.S. at 212, 99 S.Ct. at 2256; *Allen, supra,* 436 A.2d at 1309. He had been subjected to incommunicado interrogation during much of the time at the station and had not left the interrogation room on his own at any time. When Daly, "a fresh face," accompanied by another "fresh face" detective, confronted Gayden in an accusatory manner, there was a " 'show of authority' sufficient to restrain appellee's liberty." *Allen, supra,* 436 A.2d at 1309 (citing *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16). Sgt. Daly, in Detective Clark's presence, told Gayden, without any preliminary statements or advice of his *Miranda* rights, that he knew Gayden was the murderer.

Detective Helwig, who was in charge of the investigation, instigated the "fresh face" operation. Sgt. Daly conceded that his remarks were part of a deliberate interrogation technique designed to get an admission from Gayden in response to a direct accusation of his guilt. Thus, even if Gayden had been told earlier that he was free to leave, we are satisfied that at the point Daly confronted him, he was not free to leave and "would have been physically restrained" if he had attempted to do so. *Dunaway v. New York, supra,* 442 U.S. at 212, 99 S.Ct. at 2256; *Allen, supra,* 436 A.2d at 1309. The belief by the police that Gayden was guilty is likely to have influenced the manner in which they decided to

*Miranda* rights, were independent of what Gayden had told him. Nevertheless, our review of the record does not cause us to conclude that the trial court's findings that Gayden's first two statements were voluntary was clearly erroneous. *Wilkerson v. United States,* 432 A.2d 730, 734 (D.C.1981).

**10.** The trial court concluded that at the end of the second statement, Gayden would have left the police station had he felt free to go. The government challenges this conclusion on the

ground that under *United States v. Minick,* 455 A.2d 874, 880–81 (D.C.) (en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983), the statement was not a factual determination, but a legal conclusion without justification. We view the trial court's conclusion to be a reasonable inference from the record, and not "a universal pronouncement about human behavior." *Id.* In any event, it is not determinative of our analysis under the Fourth Amendment.

approach him. The positing of Gayden's guilt as a fact, when there were other "Poochies" whom the police had not yet investigated and when Mr. Black had not actually named Gayden as the killer, was designed to "show authority" so as to restrict Gayden's freedom. *Compare Miranda v. Arizona, supra,* 384 U.S. at 450, 86 S.Ct. at 1615. At that point, like the defendant in *Seals v. United States,* 117 U.S.App.D.C. 79, 81, 325 F.2d 1006, 1008 (1963), *cert. denied,* 376 U.S. 964, 84 S.Ct. 1123, 11 L.Ed.2d 982 (1964), Gayden "'would have been rash indeed to suppose that he was not under arrest'" and to attempt to leave (quoting *Kelley v. United States,* 111 U.S.App.D.C. 396, 398, 298 F.2d 310, 312 (1961)).

Second, the government emphasizes the similarities in the instant case and *Giles, supra,* 400 A.2d at 1053, noting that Helwig and McGuiness repeatedly made clear to Gayden that he was free to go and did nothing to contradict that instruction. However, this argument overlooks significant distinguishing facts between the two cases. In *Giles,* the detectives told Giles after completing their questioning that he was a primary suspect but that they had insufficient evidence to arrest him, and directed him to leave. Giles also left the interrogation room unescorted on three occasions while he was being questioned. *Id.* Neither circumstance occurred in Gayden's case: the police never directed him to leave at the end of any interview, and he never left the interrogation room without a police escort. Nor did Gayden initiate his encounter with the police as did the defendant in *Giles,* a factor the *Giles* court found "shed[s] light on the tone of ensuing events and ... has an important bearing on whether a reasonable man would believe himself to be under arrest." *Id.* at 1054.

As the government states, the relevant inquiry is whether the police actions manifested to Gayden that he was not free to leave, and not whether the police told him that he was or was not under arrest. During the more than five hours that Gayden had been in the interrogation room, he had given two statements and could hardly have been unaware that the police were skeptical about his first statement and were checking his second. The location of the interrogation room and the presence of armed officers curtailed his freedom of movement, and as time passed, his sense of isolation from family and friends undoubtedly increased. On the basis of the constant company of the police and his observations upon entering the homicide office, Gayden could reasonably have concluded that he would need the detective's permission if he wanted to leave; this was unquestionably so by the time he was confronted with his guilt by two new police officers. *See Allen, supra,* 436 A.2d at 1309. Giving "deference to the court's finding of fact as to the circumstances surrounding [Gayden's] encounter with the police," *Giles, supra,* 400 A.2d at 1054, we hold that Gayden must have understood he was under arrest when Sgt. Daly confronted him.

## B.

▮ The next inquiry is whether the police had probable cause to arrest Gayden prior to his confession to Sgt. Daly. Detective Helwig testified that prior to Daly's confrontation of Gayden, he only had a hunch about Gayden's guilt and had no concrete evidence to formally charge Gayden with murder. In Helwig's view, prior to the confession, Gayden was only a witness. Moreover, although Mr. Black had named a "Poochie," and Gayden admitted he was at the scene of the crime and his story about the car could not be verified, the police knew about a number of other "Poochies." They also knew from one of the victim's friends that Mr. Black knew several "Poochies." Detective Helwig admitted that the police had identified only one Poochie at the time they questioned Gayden, and that "Poochie is a very, very common street name." A number of people were at the scene of the crime. Mr. Black had mentioned two names as his assailants, and Gayden had named Torrell

and Owens as the killers in his first two statements; Torrell had directed the police to Gayden. The record thus suggests that just as Torrell directed the police to Gayden and Gayden had told the police that Torrell, and then Owens, was the murderer, the police had yet to determine whether other Poochies were on the scene or whether the others at the scene had seen Gayden do anything which would make it more probable than not, *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), that he was guilty of murder. Accordingly, we hold the police did not have probable cause to arrest Gayden when Daly confronted him, and his arrest was therefore unlawful.

### C.

 The final inquiry is whether Gayden's confessions should be suppressed as fruits of an illegal arrest. *Brown v. Illinois, supra; Dunaway v. New York, supra,* and our holding in *Allen, supra,* mandate that the statements be suppressed.[11] Further, the Fourth Amendment violation is not cured because Gayden was advised of his *Miranda* rights prior to giving the written confession. *Brown v. Illinois, supra,* 422 U.S. at 602, 95 S.Ct. at 2261. "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Id., quoted in Dunaway v. New York, supra,* 442 U.S. at 217, 99 S.Ct. at 2259, and *Allen, supra,* 436 A.2d at 1309. *Miranda* warnings in and of themselves cannot always make a statement sufficiently a product of free will to attenuate, for Fourth Amendment purposes, "the causal connection between the illegality and the confession." *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261. We therefore hold that

11. In *Hayes v. Florida,* —— U.S. ——, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985), the Supreme Court reaffirmed the holding in *Duna-*

both confessions must be suppressed, and affirm.

*way, supra,* that evidence obtained as a result of an illegal detention is inadmissible.