**Mark K. GAYDEN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–496.

District of Columbia Court of Appeals.

Argued Dec. 7, 1989.
Decided Dec. 28, 1990.

---

Steven Weinberg, Washington, D.C., appointed by this court, for appellant.

Celillianne Green, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Edward C. McGuire, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before BELSON, TERRY and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

Appellant was convicted by a jury of second degree murder while armed, D.C. Code §§ 22–2403, –3202 (1989). He challenges his conviction on several grounds. First, he contends that there was insufficient evidence presented at trial to support a finding that he was guilty beyond a reasonable doubt of murder, either as a principal or as an aider and abettor. He relies particularly on the ruling of this court in an interlocutory appeal in this case, affirming the trial court's suppression of appellant's confession made during a detention without probable cause. *United States v. Gayden*, 492 A.2d 868 (D.C.1985) (*"Gayden I"*). Second, appellant argues that he was denied his sixth amendment right to a speedy trial. Finally, he argues that the trial court abused its discretion in admitting into evidence a statement of the dying victim. We affirm.

I

Our standard of review for sufficiency of evidence has been often stated. "In evaluating a claim of insufficient evidence, an appellate court must review the evidence in the light most favorable to the government, recognizing the jury's right to determine the credibility of the witnesses and draw justifiable inferences from their testimony." *Frendak v. United States*, 408 A.2d 364, 370 (D.C.1979). "[C]ircumstantial evidence may be equally as probative as direct evidence." *Head v. United States*, 451 A.2d 615, 625 (D.C.1982).

Thus, "the fact that the case may rest on circumstantial evidence is of little consequence if the evidence is such that it may reasonably convince a trier of fact beyond a reasonable doubt." *Chaconas v. United States,* 326 A.2d 792, 797 (D.C.1974). "It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Frendak, supra,* 408 A.2d at 371.

■ We do not make our determination of legal sufficiency in this case on a clean slate, however. This court in *Gayden I* concluded that the government produced insufficient evidence at the suppression hearing to support a finding of probable cause to arrest appellant. *Gayden I*'s determination of the legal weight of the facts before it is binding on us. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). Thus, we cannot find the trial testimony to be sufficient to support a finding of guilt unless the trial testimony materially expanded upon the evidence presented at the suppression hearing. We think it did.

### A

■ *Gayden I* sets forth in some detail the evidence then before the court. In brief, the victim, one Bart Black, as he lay dying in the street from six bullet wounds, named "Poochie" and "Rabino" or "Rabinol" as his assailants. The police located an acquaintance of the victim, Joel Bryant, nicknamed "Rabino" and "Rabbit." Learning that appellant Gayden, who had the nickname "Poochie," was also an acquaintance of Black, the police asked him to come in voluntarily for questioning, which he did. After a change in story, he stated that he was present at the scene of the murder but "Turk" was the killer. Also present was Howard Owens,[1] who owned the car in which the three of them, together with Black, were riding and which caused damage to other cars as they left the murder scene. An immediate check by the police of Owens's car revealed no damage to it. Further questioning of appellant in an accusatory manner led to his confession to having killed Black. In *Gayden I,* we affirmed the trial court ruling suppressing the confession, holding that appellant was under arrest at that point but without probable cause.[2] As to the prior statements, however, we agreed with the trial court that appellant was not "illegally detained" when he made them, and that they were voluntary and hence admissible.

In *Gayden I,* we indicated our concerns relating to the number of potential "Poochies" and the uncertainty about the details of the crime. We noted that the Washington Area Law Enforcement computer showed 17 listings for Poochie, and the modus operandi section of the Metropolitan Police Department contained 21 listings for that nickname.[3] After referring to the interrogating officer's testimony that prior to the confession, he "only had a hunch" about appellant's guilt and considered him "only a witness," we said:

---

1. The court in *Gayden I* summarized appellant's second statement to say that among those present at the scene of the killing was "the alleged killer, 'Turk' (Howard Owens), who owned the LTD car." 492 A.2d at 870. It is clear, however, that "Turk" and Owens were two different people. Turk's real name was Tyrone Pickett.

2. The trial court's theory of suppression was that Gayden was in custody at the time of the interrogation immediately leading to the oral confession, that that confession must thus be suppressed since no *Miranda* warning had been given, and that the subsequent written confession, although preceded by a *Miranda* warning, must also be suppressed since it was the product of the improperly obtained oral confession. The two issues briefed on the interlocutory appeal were whether Gayden was in fact in custody at the time of the oral confession, and, if so, whether the written confession was in fact inadmissible as the product of the oral confession. In *Gayden I,* we ruled that the case correctly turned not on fifth amendment principles and the *Miranda* issue but instead on the policies underlying the fourth amendment exclusionary rule. 492 A.2d at 872. Thus, the probable cause issue does not appear to have played any significant factor in the presentation by the parties to the court.

3. There were no listings for Rabbit or Rabino. At trial, the investigating detective said that when he brought Gayden in for questioning, he had not investigated anyone else with the name of Poochie at that stage.

Moreover, although Mr. Black had named a "Poochie" and Gayden admitted he was at the scene of the crime and his story about the car could not be verified, the police knew about a number of other "Poochies." They also knew from one of the victim's friends that Mr. Black knew several "Poochies." Detective Helwig admitted that the police had identified only one Poochie at the time they questioned Gayden and that 'Poochie is a very, very common street name.' A number of people were at the scene of the crime.... [T]he police had yet to determine whether other Poochies were on the scene or whether the others at the scene had seen Gayden do anything which would make it more probable than not that he was guilty of murder.

492 A.2d at 874–75 (citation omitted).

At the trial itself, considerable additional specific information concerning the crime came to light through the testimony of some eighteen witnesses. The government presented the testimony of Lorraine Allen, who lived on the street where the victim was found. She testified that she heard a crash and that when she looked out of the window, she saw a light-colored car that had hit a parked van. On the passenger side of the car, she saw a man bent over. As the car drove away, she saw a person on the ground near the van. She saw no other moving vehicles and nobody else walking around or on the street other than the victim. Her husband, Lester Allen, also had heard a crash and rushed to the window. He too said the street was empty of any other moving cars or persons. One Archie Ferguson testified that he lent his 1972 yellow Chrysler [4] on the night of the killing to Ronald Reed, also known as "Puddin"; [5] that Joel Bryant, also known as "Rabbit," returned the car to him the next morning; [6] and that Ferguson found

the car seriously damaged. An enforcement officer specializing in paint analysis testified that in his opinion it was virtually certain that Ferguson's car was responsible for the paint damage caused to several vehicles parked at the scene of the crime. A crime scene search officer testified that no shell casings were found on the street. A ballistics expert testified that two of the recovered bullets came from the same gun and that the remaining bullets, although not definitely traceable, had the same class characteristics. Howard Owens, who was appellant's next-door neighbor, also testified, indicating no involvement in the crime, but confirming that appellant's long-time nickname was "Poochie" and that both Owens and appellant knew Black, who sold drugs, and had spoken with him about drug purchases. Gregg Terrell testified to the same general effect. Both Owens and Terrell denied that they were nicknamed Poochie or Rabbit. Likewise, the investigating detective testified that in the course of the investigation, no information had indicated that either Owens, Terrell or Turk had the nickname of Poochie, Rabino, or Puddin nor had Gayden referred to them as such.

Thus, at trial, significant evidence was presented to show that the car at the scene of the crime was that belonging to Ferguson, that the "Rabbit" identified by Black was Bryant, who returned the car to Ferguson, and that Reed, also known as Puddin, who borrowed the car originally, was a likely third participant. Equally important, the relevant field of Poochies had been markedly shrunken. Rather than a possible "number of people" at the murder site, the testimony showed that the street was empty of pedestrians or other cars. Owens, Terrell and Turk were effectively eliminated, as Poochies, and Bryant's nicknames were established as Rabbit and Rabino. With respect to Reed, identified as Puddin, appellant makes much of the fact

4. Lorraine Allen identified a photograph of Ferguson's car as looking like the one she had seen.

5. The trial testimony established that Ronald Reed was "Puddin" and that no other person potentially involved had that nickname. Two address books found in Bryant's possession contained the telephone number of Reed under the name Puddin and also contained Black's name and phone number.

6. Bryant brought the keys to Ferguson, who arranged for Rabbit and a friend of Ferguson's, Lawrence Lindsay, to go together to pick up the car some distance away. Lindsay also testified to the same effect at the trial.

that stapled notepapers found with Black, containing a listing of telephone numbers, carried a notation apparently reading "PUCH" or perhaps "PUCIT" with a telephone number belonging to Reed.[7] The evidentiary weight of this notation was fully argued to the jury by appellant. Moreover, Puddin was the only nickname for Reed indicated by the other evidence,[8] the entry itself shown in the notepapers was ambiguous, and other explanations could exist for the entry with Reed's phone number in any event.

In sum, we think the government presented significantly augmented evidence at the trial sufficient to warrant a reasonable jury to find appellant guilty beyond a reasonable doubt.

## B

■ We must also determine whether there was sufficient evidence to support the trial court's instruction on aiding and abetting.[9] Appellant argued at trial and, relying on *Head v. United States*, 451 A.2d 615, 626 (D.C.1982), reasserts on appeal that the trial court erred in giving the instruction since the government had for the duration of the trial proceeded against him as a principal and the evidence implicating anyone else as principal was vague. We conclude that the trial court did not err in giving the instruction and that there were facts sufficient to support a finding of aiding and abetting.

■ In a situation where for the duration of the trial the government has pro-

ceeded against the defendant as a principal and only at the close of the evidence sought an aiding and abetting instruction, such an instruction is permissible where "there is clear and convincing evidence that the defendant was present and participating in the crime." *Head, supra*, 451 A.2d at 626. "The indictment need not include a charge of aiding and abetting for the judge to give that instruction." *Id.*[10] Under such circumstances, what is required is that there "be evidence that someone other than defendant was the principal whom the defendant aided and abetted." *Payton v. United States*, 305 A.2d 512, 513 (D.C. 1973) (per curiam). It is generally agreed, however, that it is "not essential that the principal in the operation be identified so long as someone ha[s] that status." *United States v. Staten*, 189 U.S.App.D.C. 100, 109, 581 F.2d 878, 887 (1978) (footnote omitted). *See Wright v. United States*, 508 A.2d 915, 918 (D.C.1986) (in showing that a defendant has aided and abetted, the government must show, *inter alia*, that " 'a crime was committed by someone' " (quoting *Jefferson v. United States*, 463 A.2d 681, 683 (D.C.1983) (per curiam)); W. LaFave & A. Scott, Substantive Criminal Law § 6.8(c) at 160 & n. 40 (1986) (although "the guilt of the principal must be established" in order for an "accomplice" to be convicted, "[i]t is not necessary ... that the identity of the principal be established").

The evidence in appellant's statement established that appellant traveled to the scene of the crime with two men and the

---

7. The notepapers also contained another scrawled notation, apparently reading Puddin, which had another phone number of Reed's, who seemed to have at least two listings. The address books recovered from Bryant contained the telephone number of a Poochie, but the detective did not know whose number that was; it was not Gayden's or Reed's.

8. Ferguson, who identified Reed as Puddin, had known Reed, as well as his parents, for some ten years, lived on the same street, and used to see him practically every day. Another witness, Lawrence Lindsay, also testified that he had known "a person by the name of Puddin' or Ronald Reed" for about nineteen years. *See also* note 5 *supra*.

9. The trial court initially refused to give an aiding and abetting instruction. After hearing argument from counsel, the court decided that such an instruction was permissible because the decedent had "named not one individual but two individuals."

10. The first count of the indictment read:

Mark K. Gayden, Joel M. Bryant, and Ronald Reed, within the District of Columbia, while armed with a dangerous weapon, that is, a pistol, and with malice aforethought, killed Bart Black by shooting him with a pistol on or about March 2, 1983, thereby causing injuries from which Bart Black died on or about March 2, 1983. . . .

victim; that he was present at the killing; and that he fled the scene with the two men. Moreover, the statement showed that prior to the killing, he, Turk, Owens,[11] and Black were together in Turk's house where appellant overheard Turk and Owens planning Black's murder, and subsequently the four of them got into the murder car. The totality of this evidence, when coupled with the remaining evidence presented at trial and viewed in the light most favorable to the government, could well be viewed as convincingly establishing that appellant "was present and participating in the crime." *Head, supra,* 451 A.2d at 626. We have held that traveling with a principal to the scene of a crime, remaining at the scene during commission of the crime and fleeing with the principal are sufficient facts to underpin a conviction for aiding and abetting. *In re T.J.W.,* 294 A.2d 174, 176 (D.C.1972); *Creek v. United States,* 324 A.2d 688, 689 (D.C.1974) (per curiam). *See Thompson v. United States,* 132 U.S.App.D.C. 38, 39, 405 F.2d 1106, 1107 (1968).[12] Moreover, there was sufficient evidence for the jury to find beyond a reasonable doubt that someone had shot and killed Black and that appellant had fled with the killer. We therefore conclude that the trial court did not err in giving the aiding and abetting instruction.

## II

■ Appellant submits that his sixth amendment right to a speedy trial was denied. In deciding speedy trial claims, we assess four factors: "[l]ength of delay, the reason for the delay, the defendant's asser-

tion of his right, and prejudice to the defendant." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972) (footnote omitted). Here, the length of delay from arrest, on March 10, 1983, to trial, starting on December 2, 1986, was forty-five months.[13]

We have held that a delay of more than a year gives "prima facie merit" to a speedy trial claim, shifting the burden to the government to "justify the delay." *Graves v. United States,* 490 A.2d 1086, 1091 (D.C. 1984) (en banc). "However, the more serious and complex the charge, the greater is the delay that will be tolerated." *Id.*[14] As to the reasons for the delay, the Supreme Court has identified three categories subject to differing scrutiny:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker, supra,* 407 U.S. at 531, 92 S.Ct. at 2192 (footnote omitted). In addition, this court has, "in effect, created an intermediate category of 'significant' delay for government actions deemed less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to

---

**11.** Appellant identified these men as Turk and Owens, whereas the government proceeded on the theory that the other two men at the killing were Reed and Bryant. This divergence presents no insuperable problem. A jury is free to accept some parts of a party's testimony and reject others. *Kinard v. United States,* 416 A.2d 1232, 1235 (D.C.1980). Here, a jury could accept that part of appellant's statement that placed him at the scene with two other men but reject his identification of those men. Appellant may have had reasons to change the names of his accomplices, for example, fear of reprisal.

**12.** Appellant stated in his second statement: "I asked Howard if he would kill me and Howard said 'if I have to.' Then he cussed me out, just

told me to be quiet." Appellant implies that this testimony establishes that appellant fled with the other two because he was threatened. Apart from the fact that the statement only indirectly indicates that appellant felt threatened, the jury was free to disbelieve it.

**13.** The parties state that the length of delay from arrest to trial was thirty-three months. It is mystifying how the parties derive this figure.

**14.** We note that delays of more than forty-five months have been upheld. *Cates v. United States,* 379 A.2d 968, 970 (D.C.1977) (59 months); *Barker, supra,* 407 U.S. at 516–18, 92 S.Ct. at 2185–86 (62½ months).

advance trial dates due to court congestion." *Graves, supra,* 490 A.2d at 1092.

In this case, we find the delays, the reasons for the delays and their weights to be as follows: there was a three-month delay from arrest on March 10, 1983 to indictment on June 15, 1983. This delay was neutral; even four months is "not an unreasonable time" for securing an indictment. *Lemon v. United States,* 564 A.2d 1368, 1377 (D.C.1989). There followed a neutral two-week delay from indictment to arraignment; a neutral one-and-a-half-month delay from arraignment until appellant chose to file his motion to suppress; and a seven-and-a-half-month delay from appellant's filing of his motion to suppress to the hearing on the motion on April 10, 1984. This last delay was also neutral and owed to ordinary court congestion, as well as to appellant's filing of a supplemental memorandum on November 10, 1983, which required a government response, which came on January 3, 1984. A three-week delay fell between the trial court's April 10, 1984 suppression ruling and the government's April 30, 1984 notice of appeal. The government could reasonably take three weeks to decide to note an appeal and this delay was therefore neutral.

■ There followed a delay of twelve-and-three-quarters months between the government's notice of appeal, which the government moved for on an expedited basis, and this court's May 20, 1985 affirmance in *Gayden I.* We note that the elapsing of twelve-and-three-quarters months from notice of appeal to judgment is "[u]navoidable" given court congestion, not unreasonable and therefore not to be regarded as "significant". *Graves, supra,* 490 A.2d at 1096. Moreover, in determining the extent to which we should weigh against it the government's decision to appeal, we are entitled to consider "the strength of the Government's position on the appealed issue, the importance of the issue in the posture of the case, and—in some instances—the seriousness of the crime." *United States v. Loud Hawk,* 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986). Although the government ultimately lost the appeal as to the admissibility of Gayden's two confessions, the appeal was far from frivolous, as evidenced by the detailed factual analysis this court had to engage in to reach its decision in *Gayden I.* The issue of the suppression of the confessions was of great importance to the case and the crime charged, second degree murder while armed, was serious. Hence, we conclude that the government's decision to appeal was reasonable and that the ensuing delay should not be weighed heavily against the government.

There followed a five-and-a-quarter-month delay between this court's decision in *Gayden I* and the November 4, 1985 denial of the government's petition for rehearing en banc. Applying the three *Loud Hawk* considerations mentioned above, we conclude that this delay should also count as neutral. Also on November 4, 1985, the trial court set a trial date of March 27, 1986. A delay of this length—four-and-three-quarters months—before a trial can take place is not unreasonable given court congestion and is neutral delay. The trial did not occur on March 27, 1986, however, but was delayed an additional eight-and-three-quarters months, until December 2, 1986. This delay owed to several motions for continuance by the government, two of which the defense consented to; to appellant's motion to dismiss the indictment on the basis of the ruling in *Gayden I* and the speedy trial clause; and to trial court time spent ruling on a previous motion to sever trials. While some delay occasioned by the granting of government continuances may have been less than neutral, we conclude that the government has succeeded in justifying the vast majority of the forty-five-month delay from arrest to trial.

The government concedes that appellant met the third *Barker* requirement of asserting his right to a speedy trial. As to the fourth factor, prejudice, appellant has failed to show that he has suffered "oppressive pretrial incarceration," unusual "anxiety and concern" or, most important, an impairment of his defense as a result of the delay. *See Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2192. Appellant states that it is self-evident that he suffered "oppres-

sive pretrial incarceration" and "anxiety and concern." Appellant, however, was permitted to post bond, which he was unable to meet. In addition, the trial court permitted appellant to be released to the third-party custody of the Bureau of Rehabilitation on two occasions. Appellant failed to comply with the terms of his first release and was therefore re-incarcerated. As to establishing "anxiety and concern," we have implied that a defendant must do more than simply make an assertion but must show that "the alleged anxiety and concern had a specific impact on [his] health or personal or business affairs." *Graves, supra,* 490 A.2d at 1104. Appellant has made no such showing. Finally, and most importantly, appellant has not shown that the delay impaired his defense. He states only that certain notes of Officer Hilderbrand were destroyed following his arrest and that these notes would have advanced his defense. The notes, whatever their value may in fact have been, were destroyed in September of 1983, no more than five-and-a-half months after appellant's arrest. The delay beyond five-and-a-half months was therefore of no consequence and five-and-a-half months by itself requires no justification. *Graves, supra,* 490 A.2d at 1091. We therefore conclude that appellant's sixth amendment right to a speedy trial was not denied by the forty-five-month delay between his arrest and trial.

### III

■ Appellant's final argument is that the trial court abused its discretion by allowing into evidence as a spontaneous utterance Black's dying statement.[15] We will not reverse a trial court's exercise of discretion to admit or exclude hearsay evidence under the spontaneous utterance exception unless it is "clearly erroneous." *Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977). *See Price v. United States,* 545 A.2d 1219, 1226 (D.C.1988), and cases cited. Black made his statement soon after having been shot six times and

while rolling on a doorstep in extreme pain. These circumstances establish that "a serious occurrence which causes a state of nervous excitement or physical shock" took place; that Black made the statement "a reasonably short period of time after the occurrence so as to assure that [he had] not reflected upon his statement or premeditated or constructed it"; and that there were present "circumstances, which in their totality suggest spontaneity and sincerity of remark." *Nicholson v. United States, supra,* 368 A.2d at 564. We cannot say that the trial court's decision to admit the statement was "clearly erroneous."

*Affirmed.*

---

15. The trial court ruled against the statement's admissibility as a dying declaration because of its concern that Black, "however severe his condition, believed that he would survive." *See McFadden v. United States,* 395 A.2d 14, 16 (D.C. 1978).