Amy K. DAVIS, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CF–1771.

District of Columbia Court of Appeals.

Argued May 21, 1997.

Decided April 23, 1998.

---

Thomas T. Heslep, Alexandria, VA, appointed by the court, for appellant.

Eric H. Holder, Jr., United States Attorney at the time the case was briefed and argued, and John R. Fisher, Elizabeth Trosman, and Eileen Sheehan, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, and KING, Associate Judges, and BURNETT,* Associate Judge of the Superior Court of the District of Columbia.

BURNETT, Associate Judge of the Superior Court:

Appellant Amy K. Davis was convicted by a jury on three counts, burglary in the first degree while armed, threats, and possession of a prohibited weapon (flammable liquid). On appeal, appellant contends (1) that the evidence at trial was not sufficient to convict her of burglary in the first degree while armed because her actions did not constitute an "entry," and even if there was an "entry" there was not sufficient evidence of the required intent to commit a crime at the time of the "entry" into the premises; and (2) that the trial judge's giving of the *Winters* instruction shortly after the jury started deliberating was coercive and caused the jury to return guilty verdicts.[1]

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. The *Winters* instruction as set forth in the Model Jury Instructions 2.91(B) is based on *Winters v. United States*, 317 A.2d 530 (D.C.1974).

We reject each of these contentions and affirm.

## I.

Taking the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, *Blakeney v. United States,* 653 A.2d 365, 369 n. 3 (D.C.1995) (quoting *Gayden v. United States,* 584 A.2d 578, 580 (D.C.1990)), the evidence was as follows. Early in the a.m. on April 20, 1995, appellant Davis complained to police officers that she had been robbed and the man had fled into 1249 Wylie Street, N.E. When the police went to that house, Pauline Broadnax invited them in to look around. A man came down the stairs and the police questioned him outside the house. At first, Davis claimed that he was with the man who had robbed her, but later changed her story and admitted that he had been with her before the robbery. The man denied any involvement. Further, Davis gave inconsistent versions, eventually telling the police the man had run down an alley and discarded her purse in the alley. During her rendition Davis became so excited and boisterous that the officers threatened to arrest her for disorderly conduct. They finally took a report of her complaint but did not arrest anyone, and gave her a ride to the area of her home in the vicinity of Georgia Avenue and Lamont Street, N.W.

Later on April 20, 1995, shortly before 6:00 p.m., Davis returned to the area of 1249 Wylie Street, N.E. Yvette Benson testified that she was watching some children playing in front of Sophia Wright's house in the 1200 block of Wylie Street, N.E., when she saw Davis walking down the street towards Pauline Broadnax's house. Davis, as she passed Ms. Benson, told her to "get the kids in the house. I'm getting ready to set that bitch (sic) house on fire." Benson testified that Davis was carrying a blue antifreeze container and a bottle of clear liquid with a sock hanging out of it. After Benson took the children in the house, she went to the back of the 1249 Wylie Street, N.E. house and looked into the alley where she saw a crowd of people gathered. She then saw Davis throw a flaming Molotov cocktail into Pauline Broadnax's house.

Sophia Wright was at home on Wylie Street, N.E., while the children under Benson's supervision played in front of her house. Ms. Wright related that Benson then sent Wright's children into the house because of a problem in the street. Benson exclaimed that there was "a young lady outside getting ready to set Lady on fire" and tried to calm down her "kids who were screaming and hollering." Shortly thereafter, Wright saw appellant Davis chasing Pauline Broadnax in front of her house with a blue antifreeze container in her hand and heard her telling Broadnax she was going to burn her with "this gasoline."

Pauline Broadnax testified that she heard a commotion at the back of her house and, while partially dressed, went to the stairs leading downstairs and looked towards the kitchen. She heard Davis yell, "[t]ell those bitches to come out here 'cause I'm going to burn this motherfucker down." Ms. Broadnax ran back upstairs to finish dressing and then returned downstairs, where she saw a puddle of liquid on the kitchen floor and William Coleman standing in the puddle pouring water on the floor. Broadnax could smell gasoline and saw Davis "stick her hand through my grille (sic) ... to pour what was ever (sic) in the antifreeze bottle onto the kitchen floor." She then saw Davis throw a match, a Pepsi bottle, and an antifreeze jug into the house. The kitchen was immediately engulfed in flames and Mr. Coleman's pants leg and shoe caught on fire.

William Coleman testified that he had been sleeping on the couch in the living room when he heard a commotion in the back of the house. He went towards the back to the kitchen and saw Davis open the rear door, which was broken and unlocked, by reaching through the locked security gate and pushing it open. He then heard Davis yell, "[W]here is those motherfuckers? Tell them bastards, motherfuckers, come on out. I'm a burn— I'ma (sic) burn they ass up." He testified that he attempted to calm Davis down but she squeezed a blue antifreeze can through the security gate and began to pour liquid that smelled like gasoline onto the kitchen

floor. He further testified that Davis threw two bottles with gas in them through the security gate, but that neither of the bottles was lit. She then asked someone in the crowd for a match, lit the match, and threw it into the house. Coleman testified that the kitchen then erupted into flames, and that his pants and jacket caught on fire, but he was able to put the fire out. He heard the defendant yell "[b]urn motherfuckers. Let that motherfucker burn." [2]

## II.

Appellant contends that her conviction for burglary in the first degree while armed must be reversed as the evidence failed to show that she entered Pauline Broadnax's house. Even if she did, she argues that she lacked the specific intent to commit a crime therein at the time of the entry. Neither contention is persuasive.

█ Davis first argues that she never entered 1249 Wylie Street, N.E., asserting that the closest she got was standing at the security gate of the residence, from which—the government's evidence showed—she reached through the gate and poured flammable liquid into the dwelling. Davis argues in effect that "entry" under the burglary statute requires the whole body to have passed over the threshold or through the doorway. We reject this definition of the word "entry" as did the court in *Edelen v. United States*, 560 A.2d 527 (D.C.1989). While Davis contends that the court's discussion of the meaning of

the word "entry" in *Edelen* was dicta, we do not agree. The focus in *Edelen* was different, but the discussion of the meaning of "entry" was an inextricable part of the decision in that case.

In *Edelen*, the appellant had argued on appeal that because he forced the complaining witness into her apartment at gunpoint "steps ahead and seconds before" him, he could not be convicted of burglary in the first degree because the complaining witness was not "in" the apartment at the time the series of events began resulting in the criminal charges against him. *Edelen*, 560 A.2d at 528. His ancillary argument was that "entry" under the burglary in the first degree statute occurred when he approached the complaining witness outside her door and at that time the apartment was vacant. In essence, then, the issue in *Edelen* was the point in time at which "entry" occurred. The court held that entry did not occur until the instant Edelen crossed the threshold of the complainant's house, at which point the complainant was already inside. *Id.* at 529–30. It was in this context that the court stated, "Entry ... is established by the penetration into a dwelling or similar edifice by any part of the defendant's body or by any instrument inserted into the edifice by the defendant to gain entry," *id.* at 528, and that "entry" took place when Edelen's "foot first crossed the threshold." *Id.* at 530. The court's discussion of the meaning of "entry" in short, was more than simply dictum.[3]

---

2. Thereafter, Davis allegedly confronted Pauline Broadnax and William Coleman as they fled out of the front door of the house, and then continued to chase Broadnax, allegedly threatening to throw gasoline on her, threatening her with a knife, and threatening her with a brick. Further details as to these events are not necessary here, since they are not involved in the issues presented on appeal.

3. While no subsequent decision of this court has elaborated upon the meaning of "entry" in a burglary or housebreaking offense, we find significant the reliance by the Court of Appeals of the State of Maryland on our definition of "entry" in *Hebron v. State*, 331 Md. 219, 627 A.2d 1029 (1993), and its characterization of the *Edelen* decision as persuasive on this point. The court concluded that "entry" "requires that some part of the body of the intruder or an instrument used by the intruder crosses the threshold, even

momentarily, of the house." *Hebron*, 627 A.2d at 1038.

This basic definition of "entry" has also been adopted by several other state courts. *See, e.g. Sears v. State*, 713 P.2d 1218 (Alaska App. 1986); *Mullinnix v. State*, 177 Ga.App. 168, 338 S.E.2d 752 (1985); *State v. Johnson*, 587 S.W.2d 636 (Mo.App.1979); *State v. Tixier*, 89 N.M. 297, 551 P.2d 987, 988 (App.1976); *People v. King*, 61 N.Y.2d 550, 475 N.Y.S.2d 260, 463 N.E.2d 601 (1984); *Commonwealth v. Giddings*, 454 Pa.Super. 524, 686 A.2d 6, 12 (1996). *See also* WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 8.13(b) (1986) (to prove "entry," "[i]t was sufficient if any part of the actor's person intruded, even momentarily, into the structure. Thus, it has been held that the intrusion of a part of a hand in opening a window, or the momentary intrusion of part of a foot in kicking out a window, constituted the requisite entry. If the

■ Under the definition of "entry" established by *Edelen*, the evidence in this case enabled the jury reasonably to infer that Davis entered 1249 Wylie Street, N.E. First, she did so by reaching through the security gate to open the wooden door, her hand then penetrating the dwelling. Second, she reached her hand through the open space in the gate with the antifreeze jug in it to pour fluid contained in it onto the kitchen floor. Third, the jury could permissibly infer that when Davis threw two other bottles into the kitchen, she reached her hand through an open space in the security gate to do so. From this evidence, the jury could reasonably find that Davis's hand and a part of her arm crossed the threshold through the security gate and a sufficient part of the doorway entrance on three separate occasions, constituting an "entry" within the meaning of the burglary statute.[4]

■ Davis also argues that even if the evidence established an entry, there was insufficient evidence that at the time of the entry she had the specific intent to commit a crime therein. To the contrary, Davis's repeated threats toward the people in the house were sufficient to allow the jury to infer that she intended to start a fire and injure the occupants. Once the fire engulfed the kitchen and William Coleman's pants, jacket and a shoe were on fire, Davis's simultaneous statements ("burn motherfucker" and "let that motherfucker burn") revealed unmistakably her intent to inflict bodily harm on Coleman, Pauline Broadnax and other persons then within the house.[5]

### III.

The case went to the jury at about 4:30 p.m. on August 14, 1995. The next day at about 12:10 p.m. the jury sent a note indicating that it had reached a partial verdict and at about 12:30 p.m. the jury reported its verdict on seven (7) of the twelve (12) counts, finding appellant guilty of threats to injure Pauline Broadnax, and not guilty on six (6) other charges. The jury then returned to the jury room to deliberate on the remaining charges. At the end of the day, the jury sent an additional note stating that they were deadlocked and asking for further instructions. The trial judge denied the defense motion for a mistrial and decided to give the *Winters* instruction over defense counsel's objection.[6] He called the jurors in to excuse them for the day and told them that they would be given additional instructions the next morning.

The next morning he gave them the *Winters* instruction and they resumed their deliberations. At the end of the day, at about 5:40 p.m., the jury was brought in and returned a verdict of not guilty against Davis on a charge of assault with a dangerous weapon (flammable fluid), against William Coleman. The judge then told the jury, "I know you've worked long and hard on this

actor instead used some instrument which protruded into the structure, no entry occurred unless he was simultaneously using the instrument to achieve his felonious purpose.").

4. We do not find it necessary to reach the issue of whether by throwing the bottles and a match into the kitchen to set the fire she was using an instrument as an extension of herself to enter into the premises. Thus, we do not reach the issue of "entry" solely by instrument as a basis for upholding the burglary conviction in this case.

5. We note that assault is a general intent crime that may be proven by showing that "a defendant intended to do the acts which constitute the assault." *Smith v. United States*, 593 A.2d 205, 207 (D.C.1991). Further, there are two types of assault, the "attempted-battery" type and the "intent-to-frighten" type. The first type requires proof of an intent to cause actual physical injury, while the second requires intent to create apprehension in the victim by threatening conduct. *See Robinson v. United States*, 506 A.2d 572, 574 (D.C.1986). The record in this case strongly supported the second type of assault, *i.e.* intent-to-frighten, and to a perhaps somewhat lesser extent, it was also sufficient to show an intent to cause the actual burning of persons within the house if they did not flee.

6. Counsel for the defendant had expressed a preference for the "Gallagher" instruction, after the trial judge denied his motion for a mistrial. In a concurring opinion in *Winters*, Judge Gallagher proposed an alternative to the majority's proposed instruction. *Winters*, 317 A.2d at 539 (Gallagher, J., Appendix to Concurring Opinion). The trial judge responded that he believed the *Winters* instruction was more appropriate because the jury was asking for "as much guidance as they can get" and that *Winters* is "perhaps the most detailed" instruction.

case, but your job is not yet done." He asked them to report back the next morning.

On August 17, 1995, at about 2:40 p.m., the jury returned verdicts on the final remaining counts, finding Davis guilty of burglary in the first degree while armed and possession of a prohibited weapon, flammable liquid, and not guilty of arson and destruction of property.[7]

 A trial judge's decision to give the *Winters* instruction "may be overturned only if, from all the surrounding circumstances, it appears the *Winters* charge was coercive." *Coleman v. United States*, 515 A.2d 439, 453 (D.C.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987). When the judge gave the *Winters* instruction, the jury had five counts left to decide. After deliberating all day following the instruction, the jury returned a verdict on one of the major counts, assault with a dangerous weapon (flammable liquid), against William Coleman, of not guilty. When the judge made his comment that your "job is not yet done," he was only stating the obvious in excusing them to return the next morning,[8] and in no way suggesting how they should decide the remaining charges or that he would keep them deliberating for an extended period of time into the indefinite future until they decided the remaining counts. When the jury returned its verdict on August 17, 1995 at 2:40 p.m. this was almost 29 hours after the *Winters* instruction had been given, and it is significant to note that the jury returned a verdict of guilty on two charges, and not guilty on two other charges. Under these circumstances, there is absolutely no basis to infer that the *Winters* instruction had any coercive influence upon the jury.[9]

The trial judge's decision to give the *Winters* instruction was well within his discretion, and there is nothing in the record to indicate that the verdict was in any way coerced.

Accordingly, appellant's convictions are

*Affirmed.*

---

7. Counsel for Davis then moved for Judgment Notwithstanding the Verdict on the burglary in the first degree while armed offense, on the basis of inconsistency and suggesting compromise, emphasizing that Davis had been acquitted of each assault charge, yet convicted of burglary in the first degree while armed with the intent to assault. The trial judge denied this motion.

8. This is no different than telling a jury to continue to deliberate, *cf. Carey v. United States*, 647 A.2d 56, 60–61 (D.C.1994), or "please keep trying," *Calaway v. United States*, 408 A.2d 1220, 1230 (D.C.1979).

9. Appellant's claim that the verdicts were inconsistent in no way supports the contention that the giving of the *Winters* instruction was coercive. Inconsistent verdicts are not subject to challenge on the ground that they were the result of jury compromise. *See United States v. Powell*, 469 U.S. 57, 64, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (inconsistent verdicts may well be a sign of jury leniency or compromise; since the government has no recourse to correct jury errors in favor of defendants, defendants should not be allowed a new trial in such cases). Further, inconsistent jury verdicts that are, nevertheless, supported by sufficient evidence, are permissible. *Ransom v. United States*, 630 A.2d 170, 172 (D.C.1993).